447 F.2d 561
 Larness WILLIAMS, Thessie Jones and Cleophus Minter, Plaintiffs-Appellants,
v.
AMERICAN SAINT GOBAIN CORPORATION, OKMULGEE, OKLAHOMA, and Local 10, United Glass and Ceramic Workers of North America, AFL-CIO, Defendants-Appellees.
 No. 176-70.
 United States Court of Appeals, Tenth Circuit.
 June 15, 1971.
 Rehearing and Rehearing En Banc Denied October 12, 1971.
 
 Robert Belton, Charlotte, N. C., and James O. Goodwin, Okemah, Okl. (Jack Greenberg, Norman C. Amaker and William L. Robinson, New York City, on the brief), for plaintiffs-appellants.
 David L. Fist, Tulsa, Okl. (Coleman Robinson, Tulsa, Okla., on the brief), for appellee American Saint Gobain Corp.
 K. D. Bailey, Okmulgee, Okl. (Bailey & Ash, Okmulgee, Okl., on the brief), for appellee Local 10, United Glass and Ceramic Workers of North America, AFL-CIO.
 George H. Darden (Stanley P. Hebert, Gen. Counsel, and Russell Specter, Deputy Gen. Counsel, on the brief), for amicus curiae Equal Employment Opportunity Commission.
 Before LEWIS, Chief Judge, and PHILLIPS and JOHNSEN,* Circuit Judges.
 JOHNSEN, Circuit Judge.
 
 
 1
 This is a suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., for individual and class relief from an employment practice alleged to involve dicrimination because of race. Jurisdiction, both as to the district court and of the appeal, is clearly established. The district court denied leave to maintain the suit as a class action. On a trial of the merits, the court found against the plaintiffs and dismissed the action. We affirm.
 
 
 2
 The plaintiffs were three black employees in the Warehouse Department of the sheet and window glass manufacturing plant of the American Saint Gobain Corporation (herein the "Company"), located at Okmulgee, Oklahoma. Both the Company and Local 10, United Glass and Ceramic Workers of North America, AFL-CIO (herein the "Union") were made defendants. The Union was the collective bargaining representative of all employees at the plant engaged in production, maintenance, warehouse and shipping work. Plaintiffs were members of the Union.
 
 
 3
 The controversy relates to the Checker Department in the plant. This department had been created in 1950 or 1951. From the opening of the plant in 1948 until that time, the checking tasks in the Company's shipping processes had been performed by employees of the Warehouse Department (which consisted of all blacks) as part of the work of that department. This, however, left the work subject to what was known in the plant as "traffic through the job" — which meant that the most senior employee in the warehouse on the job on any given day had the right to claim the checker tasks, and which, as the court expressed it, "would result in frequent changes in the persons working as checkers".
 
 
 4
 The lack of stability thus occasioned in the checking responsibilities gave rise, according to the Company, to mistakes in shipments and to customer dissatisfactions, which led to a decision by the Company that the checker work should be removed from the channel of such job traffic and lodged in a department of its own. The court found that the setting up of the Checker Department was "intended specifically to prevent this [job traffic] and did", and further that "the evidence affords no basis for the court to conclude that this is not a good industrial practice". The Company's two principal competitors — Pittsburgh Plate Glass Company and Libby Owens — were shown to be thus handling their checker work.
 
 
 5
 The four jobs which were to exist in the new department were made the subject of general posting and plant-wide bidding and thus went to four white employees who were the persons having the greatest plant seniority among the employees who had bid. The three plaintiffs did not bid, although they had a few months more seniority than any of those who did. Plaintiffs admit that they knew of their right to choose to bid, and they make no contention, nor is there anything in the record to suggest, that they had in any way been deprived of the opportunity or induced not to bid.
 
 
 6
 A racial employment wrong would not be involved on the facts alone that the checker work was set up as a separate department; that the jobs therein were made the subject of plant-wide bidding; that they thus were awarded on a seniority basis among those who had bid; that this resulted in the jobs going to white employees; and that as it turned out, however, these white employees had somewhat less seniority than the plaintiffs did and could have asserted if they had chosen to bid. Moreover, since all this had occurred in 1950 or 1951, it would not be able in any event to have any significance under the Civil Rights Act of 1964 unless the continued existence of the Checker Department could be shown to "operate to `freeze' the status quo of prior discriminatory employment practices". Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 853, 28 L.Ed. 2d 158 (1971).
 
 
 7
 But in the carefulness with which a question of racial discrimination is entitled to be considered, the history and the collateral details of the situation will be given closer scrutiny. The Checker Department after its creation remained in existence until 1955. It was then abolished and the checking work was returned to the Warehouse Department employees. The Company at that time set up an incentive system in the Warehouse Department under which each gatherer and loader of customer orders was to do his own checking work on the shipments which he handled. The Company's evidence was to the effect that this plan was undertaken by it in the belief that such a merging of the shipping processes into complete single responsibilities would increase the efficiency of previous warehouse shipping performance and would obviate the checking difficulties which had been inherent in the former job traffic. After eight or nine months experience, however, the Company said, it turned out that the combined-responsibility plan did not produce the anticipated results as to the checking work and it decided that it would be necessary to re-establish the Checker Department in order once again to get rid of the checking problems.
 
 
 8
 The evidence of the Company as to the need for re-establishing the department showed that during the years 1951 to 1955, while the Checker Department was in existence, there had been very few complaints about mistakes in customer shipments; that after its adoption of the coordinating incentive system and the abolition of the department in 1955, complaints began again to come in from customers in substantial and increasing number of shortages and other mistakes which were occurring in their shipments; that reports also came in from some customers of overages, but the Company believed that most of the mistakes of this character were probably not being reported and it was sustaining an economic loss of unknown extent on this aspect; and that the flow of complaints from shipment mistakes once more virtually ceased after the Checker Department was re-established.
 
 
 9
 Upon the re-establishment of the department, the original holders of the checker jobs were permitted to occupy them again. This was done, as recognized by the court in its findings and not challenged by the plaintiffs in their brief, pursuant to the requirement of the collective bargaining agreement that "when a job in a department reopens, or when a department is re-established, the person who held the job at the time it was abolished is entitled to retake it".
 
 
 10
 Other aspects of the Company's operating structure and the employee relationships thereunder, that similarly are not challenged here, were also set out by the court. We quote from the court's memorandum:
 
 
 11
 "The Okmulgee plant of American Saint Gobain, in common with similar plants in the industry, is organized under the company-union contract on a job function basis and along departmental lines. Under this arrangement, the first department in which a person works for a period of sixty days after being employed is called his home department. He never loses his seniority rank there. If subsequently he transfers out of his home department, his new department is considered his resident department, and his seniority status in that department is determined by the date of his transfer. If by reason of a reduction of the work force in his resident department, or its abolition, there is no longer a place in such department for the employee, he is permitted to exercise his seniority in his home department. If he does not have sufficient seniority to displace anyone in his home department, he is then allowed on a plant-wide basis to `bump' anyone off a job for which he is qualified who has less seniority, determined by home-department rank. And finally, when a job in a department reopens or when a department reopens after having been abolished, the person who held the job at the time it was abolished is entitled to retake it. This system is applied equally to Negro and White employees, without discrimination".
 
 
 12
 The court had some difficulty on the trial in getting the plaintiffs to state specifically what it was they were complaining of. In answer to a direct question by the court, two of them stated that they were not complaining about not having a checker job. The third, when asked by the court whether what he wanted was a checker job, answered obscurely, "No, I just want to choose". He did not deny that the opportunity to bid had been open to him at the time the Checker Department was created and that, like the other two plaintiffs, he had chosen not to bid. He apparently felt that he was entitled to have had the checking work remain in the Warehouse Department and thus continuingly to have been able to have the opportunity to engage in it as a matter of departmental job traffic should he choose to do so.
 
 
 13
 What the grievance of the plaintiffs, however, ultimately seemed to strip itself down to was that the maintaining of the Checker Department, as they viewed it, operated to impose a continuing "curtailment" upon their plant seniority, in that when an occasion arose that work became slack in the warehouse, it would be necessary for them, in order not to be out of work, to engage in a transfer to other departments where they could "bump" newer (and lower-paid) employees, but that the checkers on these occasions did not have to yield to the plaintiffs and thus were receiving preferential treatment as to their seniority. It was not shown that such transfer occasions had occurred any substantial number of times, but an instance thereof was clearly proven as having occurred in 1967, and it was apparently this which had triggered the present action.
 
 
 14
 The Company's explanation of this aspect was that by agreement between it and the Union the work in the Checker Department was given a "red-circle" status, which meant that a checker would not be subject to being bumped on any slack transfers by other employees, whether from the warehouse or any other department, and that the reason for this was the need, which had underlain the creation of the department, for having a personnel stability in the handling of the checker work and avoiding anything in the nature of job traffic or transient bumping which could shift the responsibility involved in its performance. The evidence showed, without dispute, that one other job in the plant had been similarly "red circled", and there is no claim of any discrimination in this respect as to it.
 
 
 15
 It also should be noted that if any reduction was made in the force of the Checker Department, the checkers, like the warehousemen and the employees of the other departments, would have to engage in transfer to some other department in order to be able to keep on working. As a matter of fact, the jobs in the Checker Department had, as time went on and computer and other mechanical incidents began to be adopted in relation to the checking work, been reduced from the original number of four, to two at the time the suit was instituted, and to one by the time the case was tried.
 
 
 16
 Two other aspects should be mentioned in order to give the picture its fullest possible scope. One is that at the time the Checker Department was created the plant was being operated on a segregated basis. Only three or four departments, of which the Warehouse Department was one, were then open to black employees. It is undisputed, however, that except as there could be any validity in the plaintiffs' complaint against the Checker Department, all racial aspects in the plant had subsequently been eliminated and its departments were open to all employees, without regard to race. The remedying of such racial aspects as had existed appears from the evidence to have been completed by 1962. For example, in the Warehouse Department integration of employees was shown to have commenced in 1957, and a seniority roster for 1964, which was put in evidence, showed that of the 31 employees which the department then had, 12 were white.
 
 
 17
 The trial court expressly found and, as noted, no challenge is made thereto, that except as to the complaint about the Checker Department, there was no claim and no evidence "of the existence of any racial discrimination against employees in the operations at the plant during the last several years" and that "full integration of employees has been accomplished". In fact, one of plaintiffs' witnesses, who was a black, and who was currently holding a job in the skilled, previously-white Maintenance Department, testified that after the establishment of the Checker Department and during the time that he was employed in the Warehouse Department, one of the four original checkers retired or quit and he had bid on and received the night-checker job, which he held for a period of approximately 20 months, until one of the day-checker jobs was abolished and the original checker who held it exercised his resident seniority in the Checker Department to take over the night checker job from him. In harmony, however, with the concepts of the plaintiffs, the witness testified that he regarded the bumping of him from the checker job as a racial discrimination because of his having a greater plant seniority than that of the original checker.
 
 
 18
 The second aspect which should be mentioned is the following comment in which the court engaged in its memorandum: "The warehouse was a black department, and it is probably a fair deduction from the evidence, although there is no direct proof, that a factor in allowing plant-wide bidding when the checkers were established as a separate department was to give preference to white employees in the plant over Negro employees in the warehouse". To this, however, the Court immediately added: "But this was not the reason the separate department was created, and under the evidence no deduction is warranted that the checkers were re-established as a separate department for racial discriminatory purposes after it had proved unsatisfactory to operate the warehouse without regular checkers." And the court further went on to say: "It is clear * * * that regardless of what may have been the motive of the persons responsible for filling the positions in the checking department initially, racial discrimination was not involved in the decision to re-establish it, nor was racial discrimination involved in filling the Checker Department jobs when it was re-established".
 
 
 19
 A part of this expression is not without some puzzlement to us. If plant-wide bidding was not required to be used in filling the jobs of the new department, and if the use thereof was agreed upon specially between the Company and the Union for the particular situation, in order "to give preference to white employees in the plant over Negro employees", and if it succeeded in accomplishing such an intended racial result, we should think that there could be but little question that the situation would at that time have been one of racially discriminatory practice or procedure, even though this was not then, of course a remediable wrong. But if the achievement of the racial result would also operate to lock out the black warehouse employees from ever being able to become checkers in the future, then the situation would be capable, as we have suggested, of becoming a violation of the Civil Rights Act of 1964 after the Act became effective. Cf. Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245 (10 Cir. 1970). See also Quarles v. Philip Morris, Inc., 279 F.Supp. 505, 515, 516 (D.C.E.D.Va.1968), and Griggs v. Duke Power Co., supra, 91 S.Ct. at 853.
 
 
 20
 Only what the courts have termed a "business necessity" could provide a warrant for such a continuing consequence. Thus, this Court said in Lee Way Motor Freight, Inc., supra, 431 F. 2d at 249: "When a policy [or a practice or a procedure] is demonstrated to have discriminatory effects, it can be justified only by a showing that it is necessary to the safe and efficient operation of the business". To the same effect is Local 189, United Papermakers and Paperworks, AFL-CIO v. United States, 416 F.2d 980 (5 Cir. 1969).
 
 
 21
 The decisions have not been wholly uniform in the meaning or scope which they have accorded to the term "business necessity". The Supreme Court has now, however, in Duke Power Co., supra, 91 S.Ct. at 853, engaged in general expression as to it:
 
 
 22
 "The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited". [Emphasis added.]
 
 
 23
 The re-establishment of the Checker Department continued whatever racial consequence there had been in its creation, since it restored the original checkers to these jobs and thus honored the processes upon which the jobs had initially been given to them. The Company's experience during the eight or nine months that the department was abolished would, however, have competency on its contention of "business necessity" both in relation to the creation and the re-establishment of the Checker Department.
 
 
 24
 We think the "business necessity" which the court recognized as to the creation and re-establishment of the Checker Department was a valid and sufficient one in the situation. The Company did not contend that the warehousemen as blacks were not capable of doing the checker work, and there was no testimony by any of the plaintiffs that it had ever so asserted or intimated to them. Its position on the trial was that, no matter by whom the work was done, whites or blacks, it was necessary for it to be performed under conditions of stabilized and accepted individual responsibility and not in the vicissitudes of shifting job traffic, and that it was its business judgment at the time that the best way to effect this was to set up the checking work as a separate department and insulate the department against any bumpings from attempted temporary slack transfers, either by warehousemen or employees of other departments.
 
 
 25
 But to look beyond the matter of "business necessity", the evidence does not in our opinion enable it to be said that a racial discrimination was perpetrated on the plaintiffs in the establishing of the Checker Department. Plaintiffs admit that they had a right to bid and knew of their right to exercise it. They make no claim that they were deprived of the opportunity to bid or otherwise deterred from doing so.[1] They did not even testify that they felt that if they had bid, they would not have been given the checker jobs. Nor does the record provide any basis from which a court would be entitled to hold that this is what in fact would have happened. A possible intimation of why they had not been interested in bidding at the time might perhaps be reflected in their testimony on the trial that they were not complaining of not having a checker job nor seeking to obtain one.
 
 
 26
 The plant, as has been noted, did at the time consist of racial departments but this fact alone would not legally imply that the new department was going to be a white one and not a black one. Indeed, if the plaintiffs had chosen to bid, it would at the time have become a black one, unless the Company was going to refuse to honor the plaintiffs' seniority — an assumption for which the record probatively affords no basis. Thus, if the plant-wide bidding was designed "to give preference to white employees", as the trial court suggested, this could only have been in the sense and on the basis that the Company must have believed that there were white employees having a seniority status over that of the warehouse employees, who would engage in bidding. If the Company so believed, it was mistaken in that belief since what happened was that only employees who had a seniority junior to the plaintiffs actually chose to bid. And on the record, as we have stated, it cannot be held that if plaintiffs had exercised their right to bid, their seniority would not have been similarly honored and they would not have been given the jobs.
 
 
 27
 If the Company had hoped or expected to initially obtain white checkers, as the trial court apparently thought, the fact that this result occurred did not constitute in the circumstances the setting up of a racially discriminatory department. It was a white department only in the sense that the original checkers were white. But it was not maintained as a racially white department, as shown by the testimony of a black warehouse employee, referred to above, that he had bid on and received the first checker job that became vacant after the department was created, and that this had occurred in 1951 only a short time after its establishment. Further, the plaintiffs do not challenge that they are free to bid on a checker job as any remaining initial incumbent dies, retires or quits. Thus they are not racially locked out from becoming a checker. Nor can their inability to engage in temporary-slack-transfer bumpings against the holders of the checker jobs be regarded as a racial discrimination against their seniority, since that restriction has application to all employees in the plant both whites and blacks.
 
 
 28
 We hold that the court could properly find and conclude as it did, "that the company has a valid business purpose [business necessity] in maintaining the checker department as a separate department, that such practice does not violate the provisions of the Act, that a bona fide seniority and job preference system has been and is maintained at the Okmulgee plant, and that there has been no unlawful employment practice within the meaning of Section 703(a) of Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e-2(a))".
 
 
 29
 As to the court's denial of the right to maintain the suit as a class action, it is only necessary to add, beyond the fact that plaintiffs have failed to establish any right to relief in respect to themselves, that there appear to be no other black employees in the Warehouse Department who have a seniority greater than the holders of the checker jobs and certainly none can come on in the future in the hiring of new employees, to whom the question of the right to engage in temporary slack bumping against the present checkers because of their lesser seniority could have any significance or application. Besides, as we have held, the lack of right to bump the checkers is in the situation one applicable to all employees in the plant and not merely to blacks and so is without racial basis. The court did not on the facts involved in the situation err in refusing to grant leave to maintain the suit as a class action.
 
 
 30
 Affirmed.
 
 
 
 Notes:
 
 
 *
 Of the Eighth Circuit, sitting by designation
 
 
 [1]
 There was some testimony by a witness (not one of the plaintiffs) who was a former warehouse employee, that he had tried at one time to bid on a checker job but was told by the personnel manager that he could not do so. He stated at one point in his testimony that this was in 1951 and at another that it may have been in 1955. It would be reconcilable with the rest of the evidence in the case only if it occurred in 1955, at the time the Checker Department was re-established and the checker jobs were returned to the original checkers under the admitted resident-department seniority rule of the collective bargaining agreement