EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellee,

v.

UNIVERSITY OF NEW MEXICO, ALBUQUERQUE, NEW MEXICO, Defendant-Appellant.

No. 74–1119.

United States Court of Appeals, Tenth Circuit.

Argued Sept. 13, 1974.

Decided Oct. 30, 1974.

Washington Marshall, Washington, D. C. (William A. Carey, Gen. Counsel; Joseph T. Eddins, Associate Gen. Counsel; Beatrice Rosenberg and Charles L. Reischel of Employment Opportunity Commission, Washington, D. C., on the brief), for plaintiff-appellee.

John P. Salazar, Albuquerque, N. M. (William A. Sloan, Albuquerque, N. M., on the brief), for defendant-appellant.

Before MURRAH, SETH and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

This appeal is taken by the University of New Mexico (University) from an order entered by the United States District Court for the District of New Mexico, requiring it to comply with a subpoena duces tecum which had been served upon it by the Equal Employment Opportunity Commission (EEOC) during the EEOC's investigation of a charge of unlawful employment discrimination filed against the University by Dr. Jovan Djuric, an associate professor in the University's Department of Electrical Engineering and Computer Sciences.

On January 26, 1971, Dean Richard Dove of the University's College of Engineering submitted a memorandum to Dr. Djuric notifying him that he was recommending to the President of the University that proceedings be undertaken to terminate Djuric's services for, inter alia, want of fulfillment by Djuric of his contract obligations and failure to remedy the "serious negative attitude" which Dove had previously brought to Djuric's attention per memo of October 9, 1970.

Dr. Djuric thereafter on November 1, 1971, filed a complaint of unlawful discrimination "in salary and promotion" from 1966 to "the present" against the University (naming, individually, President Heady, Vice President Travelstead, Professor Koschmann and Dean Dove), with the State of New Mexico Human Rights Commission. He alleged employment discrimination based upon his ancestry and national origin (Yugoslavian) and his religious creed. On May 14, 1973, the Human Rights Commission dismissed his complaint, specifically finding that Djuric, while represented

by competent counsel, failed to "make out a case for relief."

On January 21, 1972, Victor W. Bolie, Chairman of the Department of Electrical Engineering and Computer Sciences, wrote to Dr. Djuric regarding Djuric's alleged continuing inadequacies as an Associate Professor within that Department. He set forth twelve specific statements or "causes" of lack of minimum professional standards in "performance and behavior" as a staff member during the 1971 fall semester. Our examination discloses that none of the twelve causes could be in anywise associated or related to ancestry, national origin or religious creed.

Termination proceedings were instituted on May 26, 1972, by means of a formal "Notice of Intention to Terminate" Djuric's employment as of June 20, 1973, executed by President Heady. The notice was submitted to Djuric with attachments setting forth causes, including the memorandum dated May 16, 1972, signed by *Chairman Bolie and each of the seven full professors of Djuric's Department, recommending the institution of dismissal proceedings, in light of Dr. Djuric's alleged "poor performance and antagonistic attitude" which they stated to be "unacceptable and detrimental" to the Department.* We view the memo as extremely relevant and significant. Chairman Bolie and each of the full professors had, just as Djuric, attained doctorate degrees. On August 17, 1972, Chairman Bolie again notified Djuric of specific causes evidencing Djuric's "continuing refusal" to carry his "share of the workload in this department" by alleged refusal to teach two "lab sections" during the Fall Semester of 1972.

On September 5, 1972, Dr. Djuric filed a charge with the EEOC alleging:

"After filing a charge with the Human Rights Commission of New Mexico, and the State having found probable cause, on or about May 25, 1972, the University retaliated against me by informing me that my services would be terminated as of June 30, 1973."

"I am being discriminated against because of my national origin, Yugoslav."

During the course of the investigation of the above charge, the University supplied the EEOC with requested information including: (a) records or lists of all terminations which occurred at the College of Engineering from September 1, 1970 to the present, revealing race or national origin, position hired into, date of hire, starting salary, ending salary, date of termination and reason for termination; (b) copies of memorandums or letters that any other terminated employees received if any terminations were for the same reason as Dr. Djuric's; (c) a complete copy of Dr. Djuric's personnel file; (d) all records or minutes held by the Engineering Department which led to the decision to terminate Djuric's services; and (e) a statement as to why the decision was made in May of 1972 to terminate Dr. Djuric. Thereafter, in order to conduct a more "thorough and complete investigation of the charge" the EEOC requested the University to provide further information. The University refused to do so, contending that the EEOC request was not relevant to the charge and was too broad. On May 16, 1973, the EEOC issued a subpoena duces tecum for the production of the requested additional information, to-wit:

1. Copies of personnel files of those faculty members terminated from the College of Engineering from January, 1970, to May 14, 1973.

2. Copies of personnel files of all faculty members in the College of Engineering as of May 14, 1973.

■ Following the University's refusal to comply with the subpoena, the EEOC petitioned the District Court for an order requiring obedience thereto. The Trial Court conducted hearings on August 24 and November 1, 1973. On November 2 the Court entered a "Memorandum Opinion" holding, inter alia,

that "the files sought by the Commission should contain evidence relevant to the area of inquiry of the Commission. It would be relevant to determine if any similar situations had occurred in the College, and if so, whether comparable action had been taken. As the party being investigated, it would not be appropriate for the University to have the authority to determine which files might contain evidence of comparable situations having occurred in the College." On December 3, 1973, the District Court entered its Order directing the University to produce the records and papers described in the subpoena and to make them available for inspection by the EEOC within 30 days. This appeal followed. The judgment appealed from is final and the notice of appeal presents issues for review by this Court. *Joslin Dry Goods Co. v. Equal Employment Opportunity Commission*, 483 F.2d 178 (10th Cir. 1973).

The pertinent statutes involved in this action are:

Section 709(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–8(a):

> In connection with any investigation of a charge filed under section 2000e–5 of this title, the Commission or its designated representative shall at all reasonable times have access to, for the purposes of examination, and the right to copy any evidence of any person being investigated or proceeded against that relates to unlawful employment practices covered by this subchapter (42 U.S.C.A. §§ 2000e–2000e–17) and is relevant to the charge under investigation.

42 U.S.C. § 2000e–9 provides, inter alia:

> For the purpose of all hearings and investigations conducted by the Commission or its duly authorized agents or agencies, section 161 of Title 29 shall apply.

29 U.S.C. § 161 provides, inter alia:

> For the purpose of all hearings and investigations,

> (1) The Board, or its duly authorized agents or agencies, shall at all reasonable times have access to, for the purpose of examination, and the right to copy any evidence of any person being investigated or proceeded against that relates to any matter under investigation or in question . . . Within five days after the service of a subpoena . . . such person may petition the Board to revoke, and the Board shall revoke, such subpoena if in its opinion the evidence whose production is required does not relate to any matter under investigation, or any matter in question in such proceedings, or if in its opinion such subpoena does not describe with a sufficient particularity the evidence whose production is required.

During the hearings held before the District Court, the Court and the EEOC clearly treated Dr. Djuric's complaint as one predicated upon alleged discrimination because of his Yugoslav national origin.

The University's position has consistently been that the information, files, records and documents it has already supplied the EEOC clearly evidence that the sole and only reason for Djuric's termination is that of poor job performance. The University argues that because the Djuric discrimination charge, i. e., retaliation (abandoned) and termination by reason of Yugoslav origin, is a personal and not a class complaint, that the EEOC, through its Chief Investigator, Edmund L. Trujillo, is first and foremost, under the circumstances of this case, obligated to initially and carefully examine the documentary evidence supplied by the University and to interrogate the University's President, administrative personnel and departmental professors *regarding Djuric's poor job performance* in relation to his termination in order to determine whether those causes are valid. The University thus contends that if those causes clearly support the allegation of poor job performance, there is no need to investigate or inquire further. In ef-

fect, the University argues that evidence of Dr. Djuric's poor job performance is so compelling that it constitutes the *exclusive reason* for his termination.

On several occasions during the course of the Trial Court hearings, the EEOC complained that the University was trying to dictate the manner in which it should investigate. EEOC Investigator Trujillo testified. He acknowledged that he was fully aware of the University's alleged reasons and causes for Djuric's termination evidenced by the documentary evidence supplied; that he had been so aware for a period of about ten months before the subpoena duces tecum was issued; and that during this period he did not interrogate any of the University personnel regarding Djuric's "shortcomings" in terms of his "poor job performance and uncooperative attitude" prior to inquiring into any discriminatory reasons for his termination. *Trujillo contended that he needs all of the records and personnel files demanded in the subpoena duces tecum in order to ascertain whether any of the transgressions attributed to Dr. Djuric have been committed by other employees who have been treated in the same manner as Djuric.* In this sense, the information sought would be in the nature of comparative data.

On appeal the University set forth some six specific issues, with attendant sub-issues. We consider the following issues controlling and dispositive of the University's contentions: (1) that the subpoenaed information is not relevant in that the subpoena is overbroad and unreasonable in scope in light of the fact that the University has already provided the EEOC with more than adequate evidence that Djuric's termination was not based upon any discriminatory reason but was solely and exclusively the result of his poor work (job) performance; (2) that the subpoenaed information is not sufficiently identified to protect University personnel from disclosure of confidential information and must be modified, if enforceable, so as to describe the information sought

in the various personnel files with particularity; and that (3) the subpoena violates the commands of the Fourth Amendment to the United States Constitution prohibiting unreasonable searches because the EEOC did not have probable cause prior to its issuance to believe that the University had discriminated against Dr. Djuric based upon his national origin or any other reasonable cause to believe that the University had practiced employment discrimination against him for any other reason.

I.

The Trial Court treated the Djuric charge as one alleging termination of his status as assistant professor because of his national origin (Yugoslav). Neither the Court nor the EEOC relied upon the charge that the University terminated his employment in retaliation because of the charge he had previously lodged with the New Mexico Human Rights Commission. (R. Vol. II, pp. 22, 26, 28, 81). The EEOC acknowledged that it was undertaking the subject investigation, not in relation to the "retaliation" aspect of Djuric's charge, but rather to determine whether Djuric was discriminated against for other reasons. (R. Vol. II, pp. 39, 41, 42, 69, 73).

At the threshold we observe that Title VII speaks only to the future. The only justification for a backward gaze is in determining whether a *present* employment practice may, in fact, perpetuate past discrimination.

The sole limitation imposed upon the discovery procedures of the EEOC in the conduct of investigations triggered by charges filed under 42 U.S.C. § 2000e–5 is whether the information sought is "relevant" to or "relates to any matter" under investigation or in question. 42 U.S.C. § 2000e–8(a); 29 U.S.C. § 161(1). It is fundamental that administrative subpoenas issued pursuant to these statutes require as much precision as is fair and feasible in identifying the records or materials

sought and that they cannot be so broadly stated as to constitute a "fishing expedition." Cudahy Packing Co. v. National Labor Relations Board, 117 F.2d 692 (10th Cir. 1941). *See* also Parliament House Motor Hotel v. Equal Employment Opportunity Commission, 444 F.2d 1335 (5th Cir. 1971); National Labor Relations Board v. Northern Trust Co., 148 F.2d 24 (7th Cir. 1945), cert. denied, 326 U.S. 731, 66 S.Ct. 38, 90 L.Ed. 435 (1945).

In *Cudahy Packing, supra,* we held that the only limitation "upon the power of the Board to compel the production of documentary or oral evidence is that it must *relate to or touch* the matter under investigation or in question. The Board may not go beyond this limitation and pry into the affairs of a business concern generally." 117 F.2d at 694. [Emphasis ours] *See* also Goodyear Tire & Rubber Co. v. National Labor Relations Board, 122 F.2d 450, 136 A.L.R. 883 (6th Cir. 1941).

Nothing in the governing statutes relative to investigations undertaken by the National Labor Relations Board refers to the relevancy standard applied in 42 U.S.C. § 2000e–8(a), i. e., ". . . investigation . . . access to . . . any evidence of any person being investigated or proceeded against *that relates* to unlawful employment practices covered by this subchapter *and is relevant to the charge under investigation.*" [Emphasis ours]

The University strongly contends that the information sought via the subpoena is not relevant to the Djuric investigation. The EEOC argues, contra, that it would provide comparative evidence which is often highly probative in employment discrimination cases, and that in the instant case *before the Commission can make a determination as to the merits of the general charge, it must have access to comparative data to see how the employer treated similarly situated persons of different races, sexes or national origins.* The Commission states that the question is not merely whether the reasons alleged by the University have merit, per se, but whether those reasons are pretextual and whether they reflect bias, conscious or sub-conscious, based on national origin. It is on this ground that the EEOC contends that it is entirely relevant to the charge that it investigate the subject personnel files in order to determine how faculty members of different national origins were treated *in comparable situations.*

■ The broad sweep of the Act is directed to the elimination of employment discrimination, whether practiced knowingly or unconsciously and in relation to employment or advancement criteria which, although neutral on its face, is in fact discriminatory in its application. Joslin Dry Goods Co., *supra*; Sparton Southwest, Inc. v. Equal Employment Opportunity Commission, 461 F.2d 1055 (10th Cir. 1972).

In Joslin Dry Goods Co., *supra,* the EEOC undertook an investigation upon a private grievance by a Mrs. Elnora Thompson, a black, that she had been discharged from her employment based in whole or in part on her race or color. We reversed the Trial Court's holding that because Mrs. Thompson had not been the object of any hiring discrimination, no investigation could be undertaken by the Commission relative to Joslin's hiring practices. We held that such an investigation was *relevant,* on the basis that employment practices and policies relate to hiring as well as firing.

■ The law governing the limits on the administrative power of investigation has evolved from the earlier judicial condemnation of fishing expeditions to that of enforcement of the subpoena power "if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." United States v. Morton Salt Co., 338 U.S. 632, 652, 70 S.Ct. 357, 369, 94 L.Ed. 401 (1950). All that is now required is that the investigation be for a lawfully authorized purpose. United States v. Morton Salt Co., *supra.* In United States v. Powell, 379 U.S. 48, 85 S.Ct. 248, 13

L.Ed.2d 112 (1964), the United States Supreme Court held that an investigation by the Internal Revenue Service into a question of fraudulent falsification of tax returns need not be based upon something in the nature of probable cause. The Court there said:

"We . . . hold that the Government need make no showing of probable cause to suspect fraud unless the taxpayer raises a substantial question that judicial enforcement of the administrative summons would be an abusive use of the court's process, predicated on more than the fact of re-examination and the running of the statute of limitations on ordinary tax liability." 379 U.S. at 51, 85 S.Ct. at 251.

██ The University's invocation of the Fourth Amendment prohibition against unreasonable searches and seizures is predicated upon the basic proposition that the subpoenaed faculty personnel files involve a myriad of matters, much of which is personal, private, and confidential. The University contends that these materials are privileged in that their production, in toto, is violative of the protection to be afforded faculty members to one's privacy under the Fourth Amendment. The parties to this action stipulated at trial that the subpoenaed personnel files and records are both confidential and extremely sensitive. (R. Vol. II, pp. 30–31). It is specifically proscribed that any officer or employee of the Commission who makes public in any manner such information obtained in the course of investigation shall be guilty of a misdemeanor and, upon conviction, subject to a fine of not more than $1,000.00 or imprisoned not more than one year. 42 U.S.C. § 2000e–8(e). *See* United States v. Powell, *supra.* Just as the Court in Powell, *supra,* did not require a showing of probable cause in order to sustain an IRS administrative summons of taxpayer accounts in a tax fraud investigation, so, too, in dictum, the Court observed that the "probable cause" re-

quirement has been rejected in like circumstances involving other government agencies. 379 U.S. at 57, 85 S.Ct. 248. The Court there cited Oklahoma Press Publishing Co. v. Walling, Wage and Hour Administrator, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946), and United States v. Morton Salt Co., *supra,* for the rule that the enforcement of administrative subpoenas rests upon showings that the investigation: (a) will be conducted pursuant to a legitimate purpose; (b) that the inquiry is relevant to the purpose; (c) that the information sought is not already in the possession of the administrative body; and (d) that the administrative steps required by Code have been followed.

██ We thus conclude that under the statutes here applicable that subpoena duces tecum is enforceable even though no "probable cause" has been shown that the University has violated the Act; that today that which we have previously considered to be administrative "fishing expeditions" are often permitted; and that administrative subpoenas may be enforced for investigative purposes unless they are plainly incompetent or irrelevant to any lawful purpose.

In Couch v. United States, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973), the Supreme Court held that a taxpayer under IRS investigation could not claim a legitimate Fifth Amendment privilege based upon expectation of privacy in records which he had delivered to his accountant for the purpose of preparing the taxpayer's personal income tax return.

This Court has held that charges filed with the EEOC by lay complainants who are unfamiliar with the niceties of pleading and who are generally without the assistance of counsel must be liberally construed in order to satisfy the broad substantial objectives of the Act. In Sparton Southwest, Inc., *supra,* 461 F.2d at 1059, we favorably referred to the following language from Graniteville Company (Sibley Division) v. Equal

Employment Opportunity Commission, 438 F.2d 32, 38 (4th Cir. 1971):

> The purpose of the charge under section 706 is only to initiate the EEOC investigation, not to state sufficient facts to make out a prima facie case . . . The scope of prohibited practices under Title VII is broad. The section 706(a) requirement that charges state the facts on which they are based must accordingly be given a flexible interpretation as applied to allegations of different unlawful employment practices.

See also Joslin Dry Goods Co., supra; Ammons v. Zia Company, 448 F.2d 117 (10th Cir. 1971).

We have likewise held, following Sparton, supra, that a charge filed by an EEOC Commissioner, although requiring more specificity than that of the lay complainant, is also entitled to a flexible interpretation in satisfaction of the requirements of 42 U.S.C. § 2000e–5(a). United States Steel Corporation v. United States, 477 F.2d 925 (10th Cir. 1973); Mountain States Telephone and Telegraph Company v. Equal Employment Opportunity Commission, 466 F.2d 541 (10th Cir. 1972); Adolph Coors Company v. Equal Employment Opportunity Commission, 464 F.2d 1270 (10th Cir. 1972), cert. denied 410 U.S. 929, 93 S.Ct. 1365, 35 L.Ed.2d 591 (1973).

■ We hold that the trial court did not err in finding that the subpoena duces tecum sufficiently describes the information sought and that although the information sought is confidential it must be, as stipulated, treated as such in the course of the investigation.

## II.

■ The University contends that the discovery sought should not be allowed because it relates, in part, to events reflected in the faculty personnel files which occurred prior to the effective date of the 1972 Amendments to Title VII of the Civil Rights Act of 1964 which extended its coverage to educational institutions. The Equal Employment Opportunity Act of 1972, P.L. 92–261, 86 Stat. 103 (March 24, 1972); 42 U.S.C. § 2000e et seq.

We previously observed that while Title VII speaks to the future, it necessarily embraces a backward glance in order to determine whether present employment practices are perpetuating past discriminations. Joslin Dry Goods Co., supra; Spurlock v. United Airlines, Inc., 475 F.2d 216 (10th Cir. 1972); Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245 (10th Cir. 1970), cert. denied 401 U.S. 954, 91 S.Ct. 972, 28 L. Ed.2d 237 (1971); Local No. 104, Sheet Metal Workers International Association, AFL-CIO, v. Equal Employment Opportunity Commission, 439 F.2d 237 (9th Cir. 1971); Georgia Power Company v. Equal Employment Opportunity Commission, 412 F.2d 462 (5th Cir. 1969).

In Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the United States Supreme Court held that the Act requires the elimination of artificial, arbitrary and unnecessary barriers to employment that operate invidiously to discriminate on the basis of race, and if an established employment practice that operates to exclude Negroes cannot be shown to be related to job performance, it is prohibited, notwithstanding the employer's lack of discriminatory intent. Chief Justice Burger, writing for the Court, said:

> The objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees. Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to "freeze" the status quo of prior discriminatory practices. . . . The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in

operation. 401 U.S. at pp. 429–431, 91 S.Ct. at p. 853.

## III.

Finally, we deal with University's contention that the EEOC subpoena is arbitrary, capricious and unreasonable because: (1) the EEOC already has sufficient information to make an independent determination that the action of the University is reasonable and not discriminatory; and (2) the EEOC has failed to accord substantial weight to the New Mexico Human Rights Commission finding of "no discrimination."

We readily concede that the University's argument does have practical, common sense appeal. If we assume that the EEOC should pursue the investigation to conclusion, including review of all of the information in the personnel files sought via the subpoena, and then conclude that (a) Dr. Djuric was discharged solely for lack of adequate job performance as contended by the University, but (b) other professors whose job performance records are no better than those of Dr. Djuric have been retained, what practical remedy is available to Dr. Djuric? It is inconceivable that Dr. Djuric would be reinstated under such circumstances; certainly that action could not work to the benefit of the students, given the fact of poor job performance. If, however, the end result would be the discharge of other faculty members whose personnel files likewise reflect poor job performance, one must acknowledge that ultimate beneficiaries—the students—would be grateful recipients of the EEOC effort. We do not attribute such a likely state of affairs to the governing officials of the University of New Mexico, and, in fact, find the very suggestion insulting. Be that as it may, the "broad sweep" of the Act dictates that such an inquiry may be pursued. In any event, no relief or remedy can be effected under the Act until the investigation is concluded. Even then the Commission is directed to endeavor to eliminate the alleged unlawful employ-

ment practice by informal methods of conference, conciliation, and persuasion before a court proceeding is initiated. 42 U.S.C. § 2000e–5 *et seq.*

In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the United States Supreme Court dealt with a case involving a complaint under Title VII of the Civil Rights Act of 1964 filed by a black civil rights activist who had previously engaged in disruptive and illegal activity against McDonnell Douglas Corporation (McDonnell), as part of his protest that his discharge as an employee of the firm was based upon McDonnell's racially motivated general hiring practices. The Court held that: (a) a complainant's right to sue under the Civil Rights Act of 1964 is not predicated upon EEOC finding of "reasonable cause"; and (b) in a private, non-class action complaint under Title VII charging racial employment discrimination, the complainant has the burden of establishing a prima facie case which he can satisfy by showing that: (1) he belongs to a racial minority; (2) he applied and was qualified for a job the employer was trying to fill; (3) although qualified he was rejected; and (4) thereafter the employer continued to seek applicants with complainant's qualifications. Under such circumstances, the burden then shifts to the employer to "articulate" some legitimate, non-discriminatory reason for the rejection of the complainant's application. *Significantly, however, the Court did not stop there. It noted that even should the employer's reason for rejection suffice to meet the prima facie case, still the inquiry "must not end there.":*

> While Title VII does not, without more, compel rehiring of respondent, neither does it permit petitioner [McDonnell] to use respondent's conduct as a pretext for the sort of discrimination prohibited by § 703(a)(1). On remand respondent must . . . be afforded a fair opportunity to show that petitioner's stated reason

for [his] rejection was in fact pretext. Especially relevant to such a showing would be evidence that white employees involved in acts against [McDonnell] of comparable seriousness . . . were nevertheles retained or rehired. [McDonnell] may justifiably refuse to rehire one who was engaged in unlawful, disruptive acts against it, but only if this criterion is applied alike to members of all races.

Other evidence that may be relevant to any showing of pretext includes facts as to [McDonnell's] treatment of [Green] during his prior term of employment; [McDonnell's] reaction, if any, to [Green's] legitimate civil rights activities, and [McDonnell's] general policy and practice with respect to minority employment . . . statistics as to [McDonnell's] employment policy and practice may be helpful to a determination of whether [McDonnell's] refusal to rehire . . . conformed to a general pattern of discrimination against blacks. . . . In short, on the retrial [Green] must be given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for his rejection were in fact a coverup for a racially discriminatory decision. 411 U.S. at 804–805, 93 S.Ct. at 1825.

■ Thus, just as we recognized the viability of the "business necessity rule" (Jones v. Lee Way Motor Freight, Inc., *supra*), and the nondiscriminatory, objective "job performance" rule which meets the business necessity test [Spurlock v. United Airlines, Inc., *supra*; Williams v. American Saint Gobain Corporation, Okmulgee, Oklahoma, 447 F.2d 561 (10th Cir. 1971)], still evidence presented during either the investigation of a charge or at trial thereafter raising these defenses in meeting the prima facie case cannot end the inquiry. McDonnell Douglas Corporation v. Green, *supra*; Griggs v. Duke Power Co., *supra*.

The Congress granted the courts, in those cases involving unlawful employment practice, broad remedial power, including the power to enjoin " . . . the respondent from engaging in such unlawful employment practice, *and order such affirmative action* as may be appropriate . . . *or any other equitable relief as the court deems appropriate.*" 42 U.S.C. § 2000e–5(g). [Emphasis ours]

■ We must, accordingly, hold that the trial court did not err in finding that the subpoenaed information is relevant to the charge; that the subpoena sufficiently describes the information sought and is not overbroad and unreasonable in scope; that the subpoena does not violate the Fourth Amendment prohibition against unreasonable searches; that the subpoena is not arbitrary, capricious and unreasonable; and that the subpoena is enforceable without modification.

We affirm.