**Van DAVIS et al., Plaintiffs-Appellants,**

v.

**COUNTY OF LOS ANGELES et al., etc., Defendants-Appellees.**

**Van DAVIS et al., Plaintiffs-Appellees,**

v.

**COUNTY OF LOS ANGELES et al., etc., Defendants-Appellants.**

**Nos. 73–3008 and 73–3009.**

United States Court of Appeals, Ninth Circuit.

Dec. 14, 1977.

Rehearing Denied Jan. 30, 1978.

A. Thomas Hunt (argued), Timothy B. Flynn, of Center for Law in the Public Interest, Walter Cochran-Bond, Los Angeles, Cal., for plaintiffs-appellants.

William F. Stewart (argued), Stephen Reinhardt (argued), Los Angeles, Cal., for defendants-appellees.

Lutz A. Prager, filed brief for Equal Employment Opportunity Commission, amicus curiae.

Before TUTTLE,[*] HUFSTEDLER and WALLACE, Circuit Judges.

TUTTLE, Circuit Judge:

This Court entered its original opinion in this case on October 20, 1976. The Court thereafter granted defendants-cross-appellants' motion for rehearing, and the case was regularly set down for rehearing and oral argument. Although the principal basis for the rehearing motion was the Supreme Court's decision in *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the parties were permitted to brief and argue all other issues as well.

We now withdraw the original opinion and decision, and this opinion and decision are announced in their stead.

This suit was brought on behalf of all present and future black and Mexican-American applicants for positions as firemen with the Los Angeles County Fire Department,[1] alleging that the defendants Los Angeles County, the County Board of Supervisors and the County Civil Service Commission had been guilty of racial discrimination in hiring in violation of the Fourteenth Amendment, 42 U.S.C. §§ 1981, 1983 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*[2]

The district court found that the Los Angeles County Fire Department employed blacks and Mexican-Americans grossly out of proportion to their number in the population of Los Angeles County. The court further found that the Fire Department, despite its admitted knowledge of its prior discriminatory practices and its bad reputation as an employer in the minority community, failed to undertake any effective positive steps to eradicate the effects of prior discrimination. Accordingly, the court ordered accelerated hiring of racial minorities in a ratio of one black and one Mexican-American applicant for each three white applicants until the effects of past discrimination had been erased.[3]

---

[*] Honorable Elbert P. Tuttle, Senior United States Circuit Judge, Fifth Circuit, sitting by designation.

1. The plaintiff class also included all present and future black and Mexican-American employees of the Fire Department, who alleged racial discrimination in connection with defendants' promotion practices. These additional allegations, however, were abandoned prior to trial.

2. Jurisdiction was based on 28 U.S.C. § 1343.

3. Data introduced by the plaintiffs showed that this 1–1–3 ratio, given the present rate of hiring, would produce a work force of minority firemen in proportion to the number of minority persons in the community by 1979 for blacks and 1983 for Mexican-Americans.

Despite the fact that the Mexican-American population of Los Angeles County was approximately double the size of the black population, the district court ordered identical accelerated hiring for both groups due to its finding that the Fire Department's 5'7" height requirement for job applicants was a valid requirement for employment and that this height requirement had the effect of eliminating 41% of the otherwise eligible Mexican-American applicants from consideration.

The plaintiffs appeal the trial court's finding that the 5'7" height requirement is valid and could therefore be used in limiting the relief available to the Mexican-American members of the plaintiff class. The defendants cross-appeal the trial court's order of accelerated hiring. We affirm the district court's finding of a current violation of the rights of members of this class by the improper post-1971 use of an unvalidated written test as a selection device for entry level positions and its order of accelerated hiring to cure past racial discrimination; we disagree with the court's findings that plaintiffs have standing to challenge defendants' pre-1971 use of an unvalidated written test as a selection device and that the 5'7" height requirement has been sufficiently validated by the defendants. Accordingly, we reverse and remand for reconsideration of the proper ratio of accelerated racial hiring to be ordered.

## I. Written Examination Procedures

■ Despite a minority population of approximately 29.1% in Los Angeles County, only 3.3% of the firemen employed by the defendants at the time of trial were black or Mexican-American. Plaintiffs alleged,

and the trial court found, that this severe racial imbalance resulted in part from the defendants' utilization of unvalidated written examinations to rank applicants for positions as firemen. The defendants do not, and indeed cannot, dispute that these verbal aptitude tests, administered to applicants in August 1969 and in January 1972, had a discriminatory impact on minority applicants. Of the 244 blacks who took the 1969 examination, 5 were hired; of the 100 Mexican-Americans, 7 were hired, while of the 1080 whites taking the test, 175 were hired. Thus, while approximately 25% of the 1969 applicants were black or Mexican-American, based on the results of this test only 6.4% of the hires were minorities. Black and Mexican-American applicants fared no better on the 1972 examination. Specifically, while 25.8% of the white applicants were among the top 544 scorers on the test, only 5.1% of the black applicants were included in that group. Applying the now-familiar standards announced in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the district court concluded that such statistical data alone established a prima facie case of racial discrimination in employment, thereby shifting the burden to the defendants to establish that the tests were job-related.[4] We agree that defendants failed to satisfy their burden.[5]

Defendants have challenged the plaintiffs' standing to complain of the use of the unvalidated 1969 written test. In light of the fact that plaintiffs' class did not include any prior unsuccessful applicants, it follows that plaintiffs neither suffered nor were threatened with any injury in fact from the use of the 1969 examination. No firemen were hired on the basis of success on this

---

4. The cases holding that statistics alone may prove a prima facie case of employment discrimination, thereby shifting the burden to the defendants to justify the racial imbalance, are by this time legion. See, e. g., *United States v. Masonry Contractors Ass'n of Memphis, Inc.*, 497 F.2d 871, 875 (6th Cir. 1974); *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 225 (5th Cir. 1974); *United States v. N. L. Indus., Inc.*, 479 F.2d 354, 368 (8th Cir. 1973); *United States v. Hayes Int'l Corp.*, 456 F.2d 112, 120

(5th Cir. 1972); *United States v. Ironworkers Local 86*, 443 F.2d 544, 550–51 (9th Cir.), *cert. denied*, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971).

5. Defendants conceded that no studies establishing the validity of the written employment tests have been conducted in accordance with "professionally acceptable methods." See *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

test after plaintiffs became applicants in October 1971. The parties stipulated that approximately 100 vacancies occur in the ranks of firemen each year, and testimony at trial established that 187 applicants were placed on an eligibility list following the 1969 test. Based on these facts, we must conclude that the 1969 list was depleted before plaintiffs applied for employment as firemen.

■ In the absence of a statute expressly conferring standing, it is well settled that in order to have standing a plaintiff must suffer some actual or threatened injury as a result of the alleged unlawful conduct. *See, e. g., Linda S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166–67, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Flast v. Cohen*, 392 U.S. 83, 101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); *Baker v. Carr*, 369 U.S. 186, 204–208, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). It is thus clear that plaintiffs lacked standing to challenge defendants' prior use of the test in 1969.[6]

As previously indicated, the district court reached the conclusion that defendants' use of unvalidated written examinations was an illegal employment practice through application of the principles announced in *Griggs,* a Title VII case. Subsequent to trial on the merits in this case, the Supreme Court in *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), held that to establish a prima facie case of *unconstitutional* employment discrimination, discriminatory intent or purpose must be shown rather than or in addition to a statistical showing of disproportionate impact. Defendants interpret *Washington* to require similar proof in cases alleging employment discrimination under § 1981. Accordingly, defendants urge us to reverse the decision of the district court, since no showing was made that defendants administered the 1972 examination with any intent or purpose to discriminate against minority applicants. The issue presented is one of first impression in this Circuit.[7] We have

**6.** Our holding on this point makes it unnecessary to discuss defendants' contention that the recent decision in *East Texas Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), precludes plaintiffs from attacking the defendants' pre-1971 hiring procedures.

It is equally clear that defendants' decision to employ the 1972 written test as a selection device was an unlawful employment practice which had adverse impact on the racial class of plaintiffs. The plaintiffs thus have standing to litigate the lawfulness of the 1972 test.

**7.** Only four other Courts of Appeals have had occasion to apply or construe the decision in *Washington.* The Court of Appeals for the D.C. Circuit has stated that a plaintiff proceeding under Title VII and § 1981 need not show the type of purposeful or intentional discrimination required to establish a violation of the Equal Protection Clause. *Kinsey v. First Regional Securities, Inc.,* 557 F.2d 830 (D.C. Cir. 1977) (dictum).

In *United States v. City of Chicago,* 549 F.2d 415 (7th Cir. 1977), the court reversed the trial court's finding that the defendants' written examination violated the Fourteenth Amendment solely because the plaintiffs failed to satisfy the purposeful discrimination requirement of *Washington. Id.* at 435. The *City of Chicago* plaintiffs also had alleged that the examination violated § 1981, and defendants here contend that the appeals court equated § 1981 with the

Fourteenth Amendment for purposes of determining the burden of proof applicable to non-Title VII actions. The *City of Chicago* court, however, made no mention of § 1981 in reversing the district court's ruling but specifically held that the defendants' hiring and promotion policies "did not violate *the Constitution." Id.* (emphasis added).

In *Chicano Police Officer's Ass'n v. Stover,* 526 F.2d 431 (10th Cir. 1975), an employment discrimination action alleging violations of the Equal Protection Clause, §§ 1981, 1983 and 1985, the court held that "the measure of a claim under the Civil Rights Act is in essence that applied in a suit under Title VII . . . ." *Id.* at 438. (citations omitted). Subsequently, the Supreme Court granted certiorari, vacated the judgment and remanded for reconsideration in light of *Washington v. Davis. Stover v. Chicano Police Officer's Ass'n,* 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976). Defendants here argue that had the Supreme Court intended the adverse impact rule of Title VII to apply to § 1981 actions after *Washington,* the Court simply would have denied certiorari in *Stover* and allowed the judgment to stand on the basis of a violation of § 1981 alone. However, neither the district court nor the court of appeals in *Stover* ever found that defendants had violated § 1981. Further, it is clear that the Supreme Court's action was necessitated by the court of appeal's failure to distinguish causes of action under §§ 1981 and 1983 in

carefully reviewed the Court's opinion in *Washington* and the post-*Washington* cases brought to our attention by the parties. We must reject defendants' argument.

The primary controversy in *Washington* involved the validity of a qualifying test— "Test 21"—administered to persons seeking employment with the D.C. Metropolitan Police Department. The plaintiffs alleged that Test 21 excluded a disproportionately high number of black applicants in violation of their rights under the Due Process Clause of the Fifth Amendment, 42 U.S.C. § 1981 and § 1–320 of the D.C. Code. 426 U.S. at 233, 96 S.Ct. 2040. Following various preliminary proceedings before the trial court, plaintiffs moved for partial summary judgment on their constitutional claim alone. Defendants also moved for summary judgment, asserting that plaintiffs were entitled to relief on neither constitutional nor statutory grounds. The district court, after finding that plaintiffs' statistical showing of disproportionate impact established a prima facie case of discrimination, concluded that Test 21 was "reasonably and directly related to the requirements of the police recruit training program." *Davis v. Washington,* 348 F.Supp. 15, 17 (D.D.C. 1972). Accordingly, the court granted defendants' and denied plaintiffs' motions. *Id.* at 18.

On appeal, plaintiffs argued that their summary judgment motion, which rested on purely constitutional grounds, should have been granted. The Court of Appeals for the D.C. Circuit agreed and reversed. *Davis v. Washington,* 168 U.S.App.D.C. 42, 512 F.2d 956 (1975). Announcing that it would be guided in its decision by the Title VII standards formulated in *Griggs,* the appeals

court agreed that plaintiffs' statistical showing alone, without proof of a purpose on the employer's part to discriminate, made out a prima facie case, shifting the burden of proof to the defendants: 168 U.S.App.D.C. at 47, 512 F.2d at 961. In light of the district court's finding of a nexus between Test 21 and future success *in police training school,* the court then identified the "ultimate issue" to be "whether that kind of proof [was] an acceptable substitute" for the *job-relatedness* showing required by *Griggs. Id.,* 168 U.S. App.D.C. at 48–49, 512 F.2d at 962–63. Concluding that it was not, the court directed that plaintiffs' motion for partial summary judgment be granted and the defendants' motions denied.

The Supreme Court reversed, concluding that plaintiffs "were entitled to relief on neither constitutional nor statutory grounds." *Washington v. Davis,* 426 U.S. 229, 248, 96 S.Ct. 2040, 2052, 48 L.Ed.2d 597 (1976). Mr. Justice White prefaced Part II of the majority opinion with this statement: "Because the Court of Appeals erroneously applied the legal standards applicable to Title VII cases in resolving *the constitutional issue* before it, we reverse . . . ." *Id.* at 238, 96 S.Ct. at 2046 (emphasis added). In holding that proof of racially discriminatory intent or purpose is required to show an equal protection violation, the Court disavowed ever having ruled that "a law or other official act . . . is unconstitutional *solely* because it has a racially disproportionate impact." *Id.* at 239, 96 S.Ct. at 2047. It is significant that throughout this discussion of "constitutional standards" and "Constitution-based claims,"[8] the Court mentioned neither

equating the "Civil Rights Act" and Title VII. And although the case was eventually remanded to the district court, *Chicano Police Officer's Ass'n v. Stover,* 552 F.2d 918 (10th Cir. 1977), the issue before this Court was not expressly decided.

Finally, in *Arnold v. Ballard,* 12 E.P.D. ¶ 11,-224 (6th Cir. 1976) (per curiam), the court vacated an earlier decision and remanded for reconsideration in light of *Washington.* The per curiam opinion, however, did not discuss the

issue now before us and did not explain the rationale underlying the court's decision.

8. The language used by the Court clearly indicates that Part II of the opinion was directed solely toward claims of unconstitutional employment discrimination. The following passages are illustrative: (1) "We have never held that the *constitutional* standard for adjudicating claims of invidious racial discrimination is identical" to the Title VII standards. 426 U.S. at 239, 96 S.Ct. at 2047 (emphasis added); (2) "This is not to say . . . that a law's dis-

§ 1981 nor cases construing that statute.[9] Nor can it be said that in resolving the equal protection question before it, the Court necessarily resolved the § 1981 claim on the same basis.

During recent history, every court which has considered the question has construed § 1981 to bar discrimination in employment. *See Long v. Ford Motor Co.,* 496 F.2d 500 (6th Cir. 1974); *Macklin v. Spector Freight Sys., Inc.,* 156 U.S.App.D.C. 69, 478 F.2d 979 (1973); *Brady v. Bristol-Meyers, Inc.,* 459 F.2d 621 (8th Cir. 1972); *Brown v. Gaston County Dyeing Mach. Co.,* 457 F.2d 1377 (4th Cir.), *cert. denied,* 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972); *Young v. International Tel. & Tel. Co.,* 438 F.2d 757 (3d Cir. 1971); *Sanders v. Dobbs Houses, Inc.,* 431 F.2d 1097 (5th Cir. 1970), *cert. denied,* 401 U.S. 948, 91 S.Ct. 935, 28 L.Ed.2d 231 (1971); *Waters v. Wisconsin Steel Works of Int'l Harvester Co.,* 427 F.2d 476 (7th Cir.), *cert. denied,* 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970). The courts consistently have employed Title VII principles as a benchmark not only in cases involving alleged discriminatory impact, *see Wade v. Mississippi Coop. Extension Serv.,* 528 F.2d 508, 516–17 (5th Cir. 1976); *King v. Yellow Freight Sys., Inc.,* 523 F.2d 879, 882 (8th Cir. 1975); *Kirkland v. New York State Dept. of Correctional Servs.,* 520 F.2d 420, 425 (2d Cir. 1975), *cert. denied,* 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976); *Barnett v. W. T. Grant Co.,* 518 F.2d 543, 549 (4th Cir. 1975), but in other contexts as well. *See, e. g., Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277, 1281 & n. 3 (7th Cir. 1977) (discriminatory discharge of employee); *McCormick v. Attala County Bd. of Educ.,* 541 F.2d 1094, 1095 (5th Cir. 1976) (per curiam) (available remedies). Indeed, the Supreme Court has recognized that Title VII and § 1981 embrace "parallel or overlapping remedies against discrimination." *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 47 & n. 7, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1973). In the absence of any express pronouncement from the Supreme Court—a pronouncement not delivered in *Washington*—we are unwilling to deviate from this established practice. Any unnecessary deviation not only could produce undesirable substantive law conflicts, *see Waters v. Wisconsin Steel Works of Int. Harvester Co.,* 502 F.2d 1309, 1316 (7th Cir. 1974), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976), but also would dilute what has been a potent remedy for the ills of countless minority employees subjected to the unlawful discriminatory conduct of their employers. Thus, we cannot conclude that *Washington* embraced a ruling that a showing of disproportionate impact no longer will suffice to establish a prima facie case of employment discrimination under § 1981.[10] In our view, there remains no operational distinction in this context between liability based upon Title VII and § 1981.

The defendants further argue that the district court lacked jurisdiction under either §§ 1981 or 1983 to decide these

---

9. Defendants contend that the *Washington* majority "specifically refer[red] to several § 1981 cases and note[d] their disagreement with the appellate court's reliance upon the Title VII standards of proof." The Court did note its disapproval of several cases but explained that it was in disagreement only "to the extent that those cases rested on or expressed the views that proof of discriminatory racial purpose is unnecessary in making out *an equal protection violation.*" 426 U.S. at 245, 96 S.Ct. at 2050 (emphasis added). Furthermore, each case cited in this context involved, in addition to a § 1981 claim, a claim under either the Equal Protection Clause or § 1983.

proportionate impact is irrelevant in cases involving *Constitution-based* claims of racial discrimination." *Id.* at 241, 96 S.Ct. at 2048 (emphasis added); (3) "Disproportionate impact . . . . is not the sole touchstone of an invidious racial discrimination forbidden *by the Constitution.*" *Id.* at 242, 96 S.Ct. at 2049 (emphasis added); (4) "We are not disposed to adopt [the] more rigorous [Title VII] standard for the purposes of applying *the Fifth and the Fourteenth Amendments* . . . ." *Id.* at 247–48, 96 S.Ct. at 2051 (emphasis added).

10. *Accord, League of Latin American Citizens v. City of Santa Ana,* 410 F.Supp. 873 (C.D.Cal. 1976). *But see Ortiz v. Bach,* 14 F.E.P. Cases 1019 (D.Colo.1977); *Johnson v. Hoffman,* 424 F.Supp. 490 (E.D.Mo.1977); *Resident Advisory Bd. v. Rizzo,* 425 F.Supp. 987 (E.D.Pa.1976).

claims. As to § 1983, the defendants are clearly correct. A municipality is not a "person" suable under § 1983,[11] and thus the three municipal defendants are not subject to suit under § 1983. *See City of Kenosha v. Bruno*, 412 U.S. 507, 511–13, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); *Monroe v. Pape*, 365 U.S. 167, 187–92, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Since no individual defendants were named in this suit, the plaintiffs' § 1983 claim is barred.[12] Section 1981, however, is not subject to the same jurisdictional limitations. *See Sethy v. Alameda County Water Dist.*, 545 F.2d 1157 (9th Cir. 1976) (en banc).

In summary, we believe the district court properly found defendants' use of the 1972 written examination as a selection device to be a violation of § 1981. Plaintiffs produced overwhelming statistical data to establish the test's disproportionate impact upon minority applicants, and the defendants were unable to validate the test in terms of job-relatedness.[13] Defendants' decision, prompted solely by the filing of this lawsuit, to abandon the written exam as a selection device does not moot the claim. *United States v. W. T. Grant Co.*, 345 U.S. 629, 632–33, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)[14].

## II. The 5 Foot, 7 Inch Height Requirement

Among the other of defendants' practices challenged by the plaintiffs was the 5'7" height requirement. In *Dothard v. Rawlinson*, —— U.S. ——, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), the Supreme Court held that Title VII forbids the use of height requirements which have discriminatory effect unless the employer meets "the burden of showing that [the] requirement [has] . . . a manifest relation to the employment in question." *Id.* at 2726, *quoting Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

Here there can be no question that the 5'7" height requirement has discriminatory impact. The parties stipulated that 41% of the otherwise eligible Mexican-American applicants are excluded by the requirement.[15] The defendants further conceded that no scientifically approved test has been utilized to determine whether the height requirement is in fact job-related. The only testimony in the record on point is that of Chief Stanley E. Barlow, himself only 5'8", who testified that he believed a small man might have difficulty

11. 42 U.S.C. § 1983 provides:

"Every *person* who, under color of any statute . . . of any State . . . subjects . . . any citizen of the United States . . to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress." (emphasis added)

12. Individuals may be sued in their official capacity. *See Sterzing v. Fort Bend Independent School Dist.*, 496 F.2d 92, 93 n. 2 (5th Cir. 1972); *United Farmworkers of Florida Housing Project, Inc. v. City of Del Ray Beach*, 493 F.2d 799, 802 (5th Cir. 1974); *Harper v. Kloster*, 486 F.2d 1134, 1138 (4th Cir. 1973). As the plaintiffs did not allege federal question jurisdiction under 28 U.S.C. § 1331, their Fourteenth Amendment claim does not stand apart from their § 1983 claim. Although it should be clear, we also note that since no purposeful or intentional discrimination by the defendant was proved, plaintiffs' Fourteenth Amendment and § 1983 causes of action could not have been sustained under *Washington*.

13. In Part III of the opinion in *Washington v. Davis*, the majority agreed with the district court's conclusion that Test 21 had been sufficiently validated by a validation study and other evidence showing a nexus between success on the test and success in police training school. 426 U.S. at 250–51 & n. 17, 96 S.Ct. 2040. It is at least arguable that by not requiring the defendants to meet the job-relatedness standards of Title VII, the Court implicitly held that employers sued under § 1981 may escape liability by showing something less than job-relatedness. We need not address that question here, since defendants' proof not only is insufficient under *Griggs*, but also falls far short of the quality and quantity of proof offered in *Washington*.

14. Of course, this continued threat to use the 1972 test as part of the selection process right up to the filing of the complaint in this case is admittedly a violation of Title VII.

15. We accordingly note that the continuing use of this height requirement constitutes a continuing violation of Title VII and provides a basis for relief in addition to § 1981.

working with taller men in removing long ladders and other equipment and might have a slower reaction time in climbing on and off equipment. Chief Barlow conceded that in the past firemen under 5'7" have been able to function without impairment due to their height.[16]

▮ It seems clear to us that this testimony falls far short of validating a height requirement which has a serious impact in restricting Mexican-American employment in the County Fire Department.[17] The district court did not have the benefit of *Dothard, supra,* and, therefore, did not apply the standard of proof required by that case. The evidence introduced was inadequate to meet the *Dothard* requirement that the height restriction was manifestly related to employment by the Fire Department. Accordingly, the district court's finding of job-relatedness must be reversed.

### III. *Affirmative Relief*

▮ The defendants contest the affirmative relief ordered by the district court. However, as this Court has noted,

"[t]here can be little doubt that where a violation of Title VII is found, the court is vested with broad remedial power to remove the vestiges of past discrimination and eliminate present and assure the non-existence of future barriers to the full enjoyment of equal job opportunities by qualified black workers."

*United States v. Ironworkers Local 86,* 443 F.2d 544, 553 (9th Cir.), *cert. denied,* 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971) (citations omitted). We do not believe the court lacks equal power under § 1981 to order relief. Indeed, "[i]n fashioning an appropriate remedy for employment discrimination, Congress has granted courts plenary equitable power under both Title VII . . . and section 1981." *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d

211, 243 (5th Cir. 1974) (footnotes omitted). Although the decided cases have primarily involved either Title VII or § 1983, and not § 1981, we feel the extensive case law under both sections approving affirmative relief is directly applicable here. We see no reason to limit the relief available under § 1981 merely because in the past § 1981 and Title VII have been read in tandem. *See, e. g., Boston Chapter, NAACP, Inc. v. Beecher,* 504 F.2d 1017 (1st Cir. 1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); *Franks v. Bowman Transp. Co.,* 495 F.2d 398 (5th Cir. 1974) *modified,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211 (5th Cir. 1974); *Johnson v. Goodyear Tire & Rubber Co.,* 491 F.2d 1364 (5th Cir. 1974). Similarly, we note that Title VII and § 1983 cases frequently have been cited as involving analogous principles in fashioning equitable relief, *see Rios v. Enterprise Ass'n Steamfitters Local 638,* 501 F.2d 622, 628 (2d Cir. 1974); *Carter v. Gallagher,* 452 F.2d 315, 329 (8th Cir. 1971) (en banc), *cert. denied,* 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972), and cases involving one statute have been cited in support of the relief ordered in cases involving the other.

Eight Courts of Appeals, including this one, have considered and approved the use of accelerated hiring goals or quotas to eradicate the effects of past discrimination. *See Boston Chapter, NAACP, Inc. v. Beecher,* 504 F.2d 1017 (1st Cir. 1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975) (§§ 1981 & 1983, Title VII); *Rios v. Enterprise Ass'n Steamfitters Local 638,* 501 F.2d 622 (2d Cir. 1974) (Title VII); *United States v. Masonry Contractors Ass'n of Memphis, Inc.,* 497 F.2d 871 (6th Cir. 1974) (Title VII); *Franks v. Bowman Transp. Co.,* 495 F.2d 398 (5th Cir. 1974), *modified,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) (Title VII); *Morrow v.*

---

**16.** These shorter firemen were employed during World War II when the standard was relaxed, and when firemen of other cities automatically joined the L.A. County Fire Department when their employing cities were annexed by L.A. County.

**17.** Our earlier comments with respect to validation of employment criterion challenged under § 1981 are equally applicable in this context. *See* note 15, *supra.*

*Crisler,* 491 F.2d 1053 (5th Cir.) (en banc), cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974) (§ 1983); *Vulcan Society v. Civil Serv. Comm'n,* 490 F.2d 387 (2d Cir. 1973) (§ 1983); *Associated Gen. Contractors of Mass., Inc. v. Altshuler,* 490 F.2d 9 (1st Cir. 1973), cert. denied, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974) (Title VII); *Bridgeport Guardians, Inc. v. Civil Serv. Comm'n,* 482 F.2d 1333 (2d Cir. 1973) (§§ 1981, 1983); *United States v. N.L. Indus., Inc.,* 479 F.2d 354 (8th Cir. 1973) (en banc) (§ 1983); *Pennsylvania v. O'Neill,* 473 F.2d 1029 (3d Cir. 1973) (en banc) (§ 1983); *United States v. Local 212, IBEW,* 472 F.2d 634 (6th Cir. 1973) (Title VII); *United States v. Wood Lathers Local 46,* 471 F.2d 408 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973) (Title VII); *Castro v. Beecher,* 459 F.2d 725 (1st Cir. 1972) (§ 1983); *United States v. Carpenters Local 169,* 457 F.2d 211 (7th Cir.), cert. denied, 409 U.S. 851, 93 S.Ct. 63, 34 L.Ed.2d 94 (1972) (Title VII); *Carter v. Gallagher,* 452 F.2d 315 (8th Cir. 1971) (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972) (§ 1983); *United States v. Ironworkers Local 86,* 443 F.2d 544 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971) (Title VII); *Contractors Ass'n of Eastern Pa. v. Secretary of Labor,* 442 F.2d 159 (3d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971) (Title VII); *United States v. Local 38, IBEW,* 428 F.2d 144 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970) (Title VII); *Local 53, Asbestos Workers v. Vogler,* 407 F.2d 1047 (5th Cir. 1969) (Title VII).[18] While the defendants argue § 703(j) of Title VII forbids the imposition of racial quota hiring, even were this to be an order premised solely on Title VII, we note this view has been uniformly rejected by the many courts which have considered the question.

█ We believe the district court properly exercised its discretion in ordering affirmative action to be undertaken to erase the effects of past discrimination. We do not believe that such relief may be limited to the identifiable persons denied employment in the past—for "the presence of identified persons who have been discriminated against is not a necessary prerequisite to ordering affirmative relief in order to eliminate the present effects of past discrimination." *Carter v. Gallagher,* 452 F.2d at 330.

Nor are remedial goals limited to any specific or prescribed form. The precise method of remedying past misconduct is left largely to the broad discretion of the district court. Goals have been expressed in terms of specific numbers or ratios . . . or percentages . . . . *Rios v. Steamfitters Local 638,* 501 F.2d at 631 (citations omitted).

While we remand because the district court expressly stated that the reason it ordered identical accelerated hiring of blacks and Mexican-Americans in equal ratios was because of the validity of the 5'7" height requirement, we do not necessarily believe a 1–1–3 ratio was incorrect. The court, however, should reconsider its order in light of our decision that the 5'7" height requirement is invalid and that plaintiffs lacked standing to challenge defendants' use of the 1969 written examination.

█ The defendants finally argue that the imposition of an affirmative order to hire minority applicants is unnecessary. They argue in effect that they have already commenced and that they can be relied upon further to improve their hiring practices without the added impetus of a court order. The experience of the Court of Appeals for the Fifth Circuit is useful in this regard—"protestations or repentance and reform aimed to anticipate or blunt the force of a lawsuit offer insufficient assurance that the practices sought to be enjoined will not be repeated." *Rowe v. General Motors Corp.,* 457 F.2d 348, 359 (5th Cir. 1972); accord, *United States v. Oregon State Medical Soc'y,* 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952). Here the

---

18. *Harper v. Kloster,* 486 F.2d 1134 (4th Cir. 1973) did not hold to the contrary, but upheld the district court's refusal to impose quotas within the facts of that case as not being an abuse of discretion.

record shows that the defendants had decided to use an unvalidated verbal aptitude test to hire new candidates in 1973 and that the *only* reason the test was not used was notice of this suit. The personnel director of the defendants testified at length at the trial and acknowledged that he was aware of the discriminatory impact such a test would have. Further, the trial judge found that defendants had failed and refused to take necessary affirmative steps to overcome the department's bad reputation in black and Mexican-American communities. We emphasize that this was not a close case—in a community of 29.1% minority population, only 3.3% of the firemen employed by defendants were black or Mexican-American. These factors are hardly persuasive evidence of the defendants' good faith, even were such good faith relevant in fashioning relief.[19] We agree with the district court that an accelerated hiring order is the only way "to overcome the presently existing effects of past discrimination within a reasonable period of time."

In sum, we believe the district court was wholly justified in deciding to impose affirmative hiring orders upon the defendants.[20]

While it should be obvious to all, we nevertheless repeat the admonition that nothing said by this Court is to be taken as a requirement that the defendants hire any unqualified applicant for the performance of these essential jobs.

AFFIRMED in part, REVERSED in part and REMANDED for further proceedings not inconsistent with this opinion.

WALLACE, Circuit Judge, dissenting:

I respectfully dissent.

Discrimination in employment based upon race, creed or color is a practice inconsistent with the views and aspirations of nearly all Americans and clearly repugnant to the principles upon which our society is built. But even in rooting out such an evil practice, we are bound by certain procedural and jurisdictional limitations which may serve to protect the rights of others.

I think it is clear from the record that the plaintiffs' challenges to two of the three allegedly illegal employment practices are barred by such a jurisdictional limitation. The majority concedes that the named plaintiffs have no standing to attack the defendants' pre-1971 hiring procedures. I agree. I believe it equally plain that they lack standing to challenge the height limitation.

As to the remedy, I conclude that while the plaintiffs may well have standing to challenge the post-1971 hiring procedures, there is a critical issue as to whether the imposition of minority hiring quotas is now warranted given the limited scope of this issue and the circumstances under which the defendants' objectionable conduct occurred. Because the district court imposed quotas based on conduct which in large part has been rejected by the majority as a basis for remedial action, the district judge may well now believe that mandatory quotas are no longer appropriate. Because the question should be resolved in the first instance by the trial judge, I would reverse and remand for reconsideration of the appropriate remedy in light of the limited standing of the plaintiffs and the nature of the defendants' conduct within the new, limited time frame adopted by the majority in this case.

### I. *The Height Limitation*

As an initial matter, it is clear to me that the issue of the 5'7" height limitation was never properly before the district court. The issue comes to us by a curious route. The plaintiffs phrase their request for relief as follows:

**19.** In *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), a Title VII case, the Supreme Court rejected good faith as a defense. "Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation." *Id.* at 432, 91 S.Ct. at 854. We believe good faith is equally inapplicable to § 1981.

**20.** We do not read *United Air Lines v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) to restrict in any way the affirmative relief ordered in this case.

The only modification of the Judgment sought in this appeal is an increase of the Mexican-American hiring ratio, such increase to be ordered if there is a reversal by this Court of Appeal of the District Court's conclusion of law that the height standard is job-related and legal. Plaintiffs-appellants did not seek below and do not seek on this appeal, an order enjoining the use of the 5′7″ height standard.

Since the plaintiffs do not contest the legality of the height limitation, I do not see how the district judge erred in taking the height limitation into account in fashioning the remedy.

But even assuming the height limitation is properly at issue, the parties before us do *not* have standing to pursue it. None of the named plaintiffs is alleged to be shorter than 5′7″. To the contrary, it has been stipulated that all of the named plaintiffs are present employees or presently on an eligibility list. Since one of the requirements is a minimum height of 5′7″, each of them must be at least that tall. Consequently, none of them have suffered an injury-in-fact from the alleged discriminatory practice. In addition, since the class was certified as "all present and future . . . Mexican-American applicants," some of whom will surely be less than 5′7″ tall, the named plaintiffs cannot properly represent them because their interests are potentially antagonistic. Fed.R.Civ.P. 23(a)(3), (4). Indeed, applicants 5′7″ or taller have an interest in limiting the number of their competitors by retaining the height requirement. This may be the reason why the plaintiffs did not ask that the height limitation be enjoined but merely now seek a larger hiring quota for Mexican-Americans in spite of it. These facts amply demonstrate the need for and the protection built into standing requirements. Although this lack of standing is obvious, it is not even discussed by the majority.

## II. *The Pre-1971 Examination Procedures*

The villain of the pre-1971 examination procedures was a discriminatory written test used as a ranking device. All hiring was done from an eligibility list which was the final product of an examination process. The process began with the written test and a physical agility test and the top scorers were then selected for oral interviews. A total score was given each applicant, with the discriminatory written test having a 35 percent weighted value. The highest ranking candidates were certified for placement on the eligibility list from which vacancies were filled. When the list was exhausted, which usually happened in about two years, a new examination process would begin in order to produce a new eligibility list.

The district court held that the plaintiffs made out a prima facie case of employment discrimination by proving that at the time the complaint was filed in 1973, only 3.3 percent of the firemen employed by the defendants were black or Mexican-American despite the fact that those minorities accounted for approximately 29.1 percent of the population of Los Angeles County.[1] These employment statistics are necessarily the result of the defendants' pre-1971 hiring practices since no firemen were hired thereafter until the complaint was filed. But the majority admits that the plaintiffs lacked standing to challenge these practices. Consequently, the pre-1971 practices were entitled to only a narrowly restricted role in the fashioning of the remedy in this case, as explained in part III. C. below.

### III. *The Post-1971 Examination Procedures*

#### A. *The Facts*

Prior to accepting applications for a new examination procedure in 1971, the entire procedure was changed. Since the named plaintiffs' applications were processed under these new procedures, they clearly have standing to litigate their legality. Given the limited scope of the claim, however, I

---

1. The district court found that 10.8 percent of the population of Los Angeles County was black and 18.3 percent Mexican-American.

question the appropriateness of the sweeping injunctive relief granted.

The new procedures were to be as follows. Written tests were to be eliminated as a ranking device, but because of the large number of applicants (3500) and the relatively few job openings (33), some method had to be adopted to limit the number of applicants interviewed. Thus a new written test was designed in an attempt to eliminate cultural bias. The test was to be given and graded on a pass-fail basis for the sole purpose of screening out illiterates. Five hundred of the passing applicants were to be selected at random for oral interviews. This method eliminated the written test as a ranking device and gave every passing applicant an equal opportunity to be chosen for an oral interview. Ninety-seven percent of the applicants passed the written test; 1,885 were white, 170 black and 283 Mexican-American. The passing applicants were to be ranked solely on the basis of the results of the physical agility test and the oral interviews.

The new written test was administered in 1972, but before the random selection could be made, a lawsuit was filed in state court against the county, charging that the random selection process violated provisions of the county charter and civil service regulations requiring that selection for oral interviews be made on merit. The county was enjoined from using this method pending trial on the merits. As a result, the examination process was halted for over two years and no interviews or physical tests were given and no eligibility list was certified.

As vacancies increased, the county fire department urged that the applicants who by this time had been waiting for almost 18 months, be interviewed and an eligibility list certified. In desperation, the county Department of Personnel proposed to interview those applicants who had received the top 544 scores on the 1972 written test. Of this number, 492 were white, 10 black and 33 Mexican-American. These applicants were not to be ranked on the basis of the test results, however, and the interviews

were not intended to eliminate the remaining applicants from consideration. The purpose was solely to expedite the hiring of sufficient firemen to meet the immediate, urgent requirements of the fire department.

The plaintiffs herein objected to this proposal. Upon learning of the complaint about to be filed in this action, the Director of Personnel abandoned the plan and implemented a new procedure whereby all of the passing applicants would be interviewed. The interviews commenced on January 20, 1973.

The plaintiffs filed this civil rights action naming as defendants the County of Los Angeles, the Board of Supervisors of the county and the Civil Service Commission. The complaint alleged racial discrimination in violation of 42 U.S.C. §§ 1981 and 1983; it was later amended to invoke Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e et seq. as well. The defendants completed interviewing all of the applicants by the end of March 1973 and certified an eligibility list. Of the top 315 applicants on this list, 210 were white, 39 black, 59 Mexican-American and 7 of other races (a total of 33.5 per cent "minorities"). It was conceded by the plaintiffs that this examination and ranking procedure did not have a discriminatory impact on blacks and Mexican-Americans.

At the conclusion of the trial, the district court specifically found that the defendants had not interfered with affirmative action efforts designed to increase black and Mexican-American participation rates and that, to the contrary, several officials had engaged in efforts designed to increase minority representation in the fire department. The court further found that neither the defendants nor their officials had engaged in employment practices with a willful or conscious purpose of excluding blacks and Mexican-Americans from employment.

The court concluded, however, that the defendants had engaged in the discriminatory employment practice of utilizing as a selection device non-validated written tests that had a disproportionate detrimental im-

pact on blacks and Mexican-Americans. This evidently included the defendants' short-lived intent to interview only the top 544 scorers on the 1972 examination. This, of course, is the *only* examination procedure of which the plaintiffs may complain since they lack standing to challenge all previous examinations.

B. *Liability for the Attempted Use of the 1972 Examination*

In deciding that the attempted use of the 1972 written examination was illegal, the majority relies almost exclusively upon 42 U.S.C. § 1981. Only in a footnote is it mentioned that this same conduct also constitutes a Title VII violation.[2] I agree with the majority that under *United States v. W. T. Grant Co.,* 345 U.S. 629, 632–33, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), the defendants' decision, prompted by the commencement of this lawsuit, not to use improperly the 1972 examination as a selection device, does not shield them from liability. But I would base that liability on Title VII, not section 1981. The majority's extensive discussion of section 1981 is not only incorrect, but in this case it is wholly unnecessary.

The district judge found as a matter of fact that "neither the defendants nor their officials had engaged in employment practices with a willful or conscious purpose of excluding blacks and Mexican-Americans from employment." Since a prima facie case under Title VII clearly does not require proof of an improper purpose when a discriminatory impact is alleged, *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), this finding does not put defendants beyond the reach of Title VII.

The majority's decision that section 1981 similarly requires no proof of intentional discrimination is both unnecessary and unfortunate. The potential scope of section 1981 is exceptionally broad, going far beyond the Title VII realm of employment, and conceivably reaching virtually all private contractual arrangements. *See Runyon v. McCrary,* 427 U.S. 160, 168–71, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976). Since the relief available under Title VII is extensive enough to include the remedy approved by the majority in this case,[3] the wiser course would be to base the finding of liability on that statute and to wait for a more appropriate opportunity to consider the reaches of section 1981. Since the majority does choose to rely upon section 1981, however, I wish to make it clear that I cannot accept its easy conclusion that a prima facie case under that statute does not require proof of discriminatory intent.

The majority asserts that the Supreme Court's opinion in *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), does not address the question of whether cases brought under section 1981— like those brought directly under the Fourteenth Amendment—always require proof of discriminatory intent, or whether—as in Title VII cases—proof of discriminatory impact alone may be sufficient.[4] I agree. But *Washington v. Davis* serves at least to

2. Even if they had had proper standing, the plaintiffs could not have attacked defendants' pre-1972 procedures under Title VII since that statute first became applicable to state public employers on March 24, 1972. Since a stipulation states that the defendants abandoned their plan to make a discriminatory use of the 1972 exam on January 8, 1972, Title VII is arguably unavailable to the plaintiffs as a basis of liability in this case. In that event, and in light of the subsequent analysis in the text, the defendants would be absolved of all liability whatsoever. It appears, however, that the stipulated date may be in error, and in addition it seems to me that a persuasive argument can be made that the threat to use the 1972 examination in a discriminatory manner can fairly be construed as continuing after March 24, 1972, thus providing a legitimate basis for some relief to the plaintiffs.

3. "[T]he remedies available to the individual under Title VII are co-extensive with the indiv[i]dual's right to sue under the provisions of the Civil Rights Act of 1866, 42 U.S.C. § 1981 . . . ." *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459, 95 S.Ct. 1716, 1719, 44 L.Ed.2d 295 (1975), *quoting* H.R.Rep. No. 92–238, 92nd Cong., 1st Sess. 19 (1971).

4. As the majority notes in footnote 7 of its opinion, few courts have had occasion to construe section 1981 in light of *Washington v. Davis.* Of those which have dealt with the issue explicitly, most have done so without analysis, *e. g., Kinsey v. First Regional Securi-*

remind us that improper intent may be an essential ingredient in some discrimination cases where the lower courts have heretofore thought otherwise. When it is necessary to decide such cases on the basis of authority other than Title VII or the Fourteenth Amendment, therefore, a most careful reconsideration of the role of discriminatory intent is in order.

The majority reasons that because both Title VII and section 1981 apply to employment discrimination cases, because the remedies available under these two statutes are "parallel or overlapping," *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 47 & n.7, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), and because *Washington v. Davis* does not decide that intentional discrimination is required under section 1981, "there remains

no operational distinction in this context between liability based upon Title VII and section 1981." This analysis is inadequate.[5]

That both statutes can apply to the same facts and that both may afford similar remedies is beside the point. The same can be said of Title VII and the Fourteenth Amendment, yet, after *Washington v. Davis,* there remains an essential "operational distinction" between them. The proper inquiry is whether the legislative history of section 1981 indicates that it *should* track the Fourteenth Amendment's standards of proof rather than those of Title VII. I believe that the history of section 1981 strongly suggests precisely that.

Because section 1981 is peculiarly linked to the Fourteenth Amendment, the stan-

ties, Inc., 557 F.2d 830, 838 n.22 (D.C.Cir.1977), or under the assumption, rejected by us today, that *Washington v. Davis* did decide the section 1981 question. *E. g., League of United Latin Am. Citizens v. City of Santa Ana,* 13 FEP Cases 1019-20 (C.D.Cal.1976). The only post-*Washington v. Davis* cases I have located that shed any light on the problem support the position taken in this dissent. *Croker v. Boeing Co.,* 437 F.Supp. 1138 (E.D.Pa.1977); *Johnson v. Hoffman,* 424 F.Supp. 490, 493-94 (E.D.Mo. 1977).

Significantly, the Supreme Court vacated and remanded the Tenth Circuit's decision in *Chicano Police Officer's Ass'n v. Stover,* 526 F.2d 431 (10th Cir. 1975), *cert. granted, vacated, and remanded,* 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976), in which it was held that "the measure of a claim under the Civil Rights Act [*i. e.,* section 1981 *et seq.*] is in essence that applied in a suit under Title VII of the Civil Rights Act of 1964." 526 F.2d at 438. *Stover* did not involve Title VII, but turned on sections 1981, 1983, and 1985, suggesting that the Supreme Court may well believe that constitutional standards apply in section 1981 cases. This is the interpretation placed on the Supreme Court's action by the Tenth Circuit panel that originally decided *Stover,* as evidenced by their treatment of the case on remand. *Chicano Police Officer's Ass'n v. Stover,* 552 F.2d 918, 920 (10th Cir. 1977).

5. The majority's analysis is not helped by the string of citations offered in support of the propositions that section 1981 has been applied "to bar discrimination in employment," and that Title VII principles are a "benchmark" in discrimination cases. The burden of these cases is that section 1981 provides a cause of action for private acts of employment discrimination and that it was not implicitly repealed

by Title VII. I do not disagree. If any of these decisions arguably imply that section 1981 and Title VII are equivalent with respect to the required elements of a prima facie case, it should be noted that all but two of them were rendered prior to *Washington v. Davis,* and of those, none offers any analysis of the critical issue of discriminatory intent which the opinion in that case revived as a major factor in discrimination law. The two post-*Washington v. Davis* decisions, *Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277 (7th Cir. 1977) and *McCormick v. Attala County Bd. of Educ.,* 541 F.2d 1094 (5th Cir. 1976), make no reference to *Washington v. Davis* or to the issues it discussed. Thus, none of these cases contributes much to the resolution of the issue at hand.

Actually, one of the Fifth Circuit cases relied upon by the majority, *Wade v. Mississippi Coop. Extension Serv.,* 528 F.2d 508 (5th Cir. 1976), undermines the majority's position. *Wade* specifically rejected the lower court's application to section 1981 of "the standard of proof established by the regulations implementing Title VII" and held that "[u]nder the law of this circuit, . . . *public employment tests are to be judged under a constitutional standard in suits brought under 42 U.S.C.A. §§ 1981, 1983.*" *Id.* at 518 (emphasis added). The court in *Wade,* although it had the foresight to recognize that *Washington v. Davis,* then pending before the Supreme Court, could affect its understanding of the issues in the case before it, *id.* at 518 n.7, unavoidably lacked the wisdom later supplied by *Washington v. Davis* that purposeful discrimination is one element of the constitutional standard. But of interest here is the Fifth Circuit's recognition that section 1981 tracks the Constitution, not Title VII, in its standards of proof.

dards pertaining to that amendment should also control section 1981. Of course, Title VII also depends in part upon the Fourteenth Amendment for its validity.[6] Title VII, however, was intentionally structured to rest upon as many other constitutional bases as possible.[7] It is otherwise with section 1981. Section 1981 originated in two earlier statutes: section 1 of the Civil Rights Act of 1866, 14 Stat. 27, and section 16 of the Voting Rights Act of 1870, 16 Stat. 144. *Runyon v. McCrary, supra,* 427 U.S. at 168–70 n.8, 96 S.Ct. 2586. The 1866 Act is generally regarded as a "Thirteenth Amendment statute," *see Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 422, 437–38, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), but it has also been found to rely upon the Fourteenth Amendment. In fact, part of the motivation behind the congressional support of the Fourteenth Amendment was to eliminate doubts about the constitutionality of the 1866 Act. *Id.* at 436, 88 S.Ct. 2186. The

second root of section 1981, section 16 of the Voting Rights Act of 1870, is clearly a "Fourteenth Amendment statute," *Runyon v. McCrary, supra,* 427 U.S. at 195–202, 96 S.Ct. 2586 (White, J. dissenting); its legislative history demonstrates that its precise purpose was to implement the congressional powers created by that Amendment. *Id.*

The significance of this is that section 1981 enjoys a unique historical and conceptual relationship to the Fourteenth Amendment which is not shared by Title VII.[8] Consequently, it is quite proper to assume, absent a contrary holding by the Supreme Court, that the standards for establishing a prima facie case of discrimination under section 1981 and the Equal Protection Clause of the Fourteenth Amendment should be the same: there must be proof of discriminatory intent.

Other factors reinforce this conclusion. Interpreting section 1981 to require discriminatory intent is consistent with the Su-

---

**6.** *E. g., Fitzpatrick v. Bitzer,* 427 U.S. 445, 447–48, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) (1972 amendments to Title VII rely upon Fourteenth Amendment). With respect to section 1981, see subsequent text.

**7.** In his June 19, 1963 message to Congress, President John Kennedy submitted a proposed bill which developed into the Civil Rights Act of 1964 and which contained the embryo of what is now Title VII. The proposed bill was expressly made to rely upon

the exercise by Congress of the powers conferred upon it to regulate the manner of holding Federal Elections, to enforce the provisions of the fourteenth and fifteenth amendments, to regulate commerce among the several States, and to make laws necessary and proper to execute the powers conferred upon it by the Constitution.

H.R.Doc. No. 124, 88th Cong., 1st Sess. 14 (1963). That the present version of Title VII rests on more than the Civil Rights Amendments may also be seen in the deliberate inclusion of interstate commerce concepts in Title VII's definitions, signifying a reliance upon the Commerce Clause. 42 U.S.C. § 2000e(b)–(e), (g) & (h). Cf. *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 249–50, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (Title II of Civil Rights Act of 1964 valid under the Commerce Clause).

Several courts of appeals, including our own, have found that Title VII extends beyond the reach of the Equal Protection Clause. *E. g., Berg v. Richmond Unified School Dist.,* 528

F.2d 1208, 1212 n.8 (9th Cir. 1975), *cert. granted,* 429 U.S. 1071, 97 S.Ct. 806, 50 L.Ed.2d 788 (1977); *Satty v. Nashville Gas Co.,* 522 F.2d 850, 855 (6th Cir. 1975), *cert. granted,* 429 U.S. 1071, 97 S.Ct. 806, 50 L.Ed.2d 788 (1977); *Communications Workers v. American Tel. & Tel. Co.,* 513 F.2d 1024, 1031 (2d Cir. 1975), *cert. granted, vacated and remanded,* 429 U.S. 1033, 97 S.Ct. 724, 50 L.Ed.2d 744 (1977). Although the holdings in these cases that the exclusion of pregnant women from certain insurance and other employment benefits have been undermined or put in doubt by *General Elec. Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), the *Gilbert* decision itself does not question the idea that Title VII invokes congressional powers beyond those derived from the Fourteenth Amendment. Rather, *Gilbert* simply holds that the exclusion of pregnancy benefits from an employer's disability insurance plan does not constitute a sex-based discrimination capable of invoking either Title VII or the Fourteenth Amendment. *Id.* at 136, 97 S.Ct. 401.

**8.** As *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), makes clear, section 1981 is also very closely tied to the Thirteenth Amendment. *Washington v. Davis* did not decide whether discriminatory intent is required in Thirteenth Amendment cases. I think that it is, but any uncertainty in this assumption merely underscores that the majority's decision to delve into section 1981 is unwise.

preme Court's statement in *Jones v. Alfred H. Mayer Co., supra,* that Congress intended section 1 of the Civil Rights Act of 1866—the source of what is now section 1982 as well as one source of section 1981— "to prohibit *all racially motivated* deprivations of the rights enumerated in the statute . . . ." *Id.* 392 U.S. at 426, 88 S.Ct. at 2196 (emphasis partly added). That racial motivation was originally meant by Congress to be a requirement in actions under the 1866 Act is further suggested by section 2 of the Act which imposes criminal penalties upon anyone who, under color of law, deprives another of the rights protected by section 1 "by reason of his color or race." 14 Stat. 27.[9]

In addition, there are practical reasons for requiring proof of discriminatory intent in section 1981 cases, but not in Title VII cases. Title VII is part of a complex statute; together with its accompanying administrative regulations it identifies with particularity the conduct it proscribes and imposes a course of administrative remedies that must be exhausted before the jurisdiction of the courts may be invoked. 42 U.S.C. § 2000e–5; 29 C.F.R. §§ 1601.1 *et seq.* Because these barriers tend to eliminate claims that are frivolous or suffering from obvious legal or factual defects, it is not unreasonable to provide that a prima facie case may be established without a showing of discriminatory intent.

Section 1981 is a very different statute. Its language is both brief and sweeping in scope, and it does not have the screening mechanism provided by a requirement of the exhaustion of administrative remedies. The section 1981 screening mechanism, as in actions proceeding directly under the Fourteenth Amendment, is the required demonstration of discriminatory intent.

Indeed, because section 1981 can probably be invoked in a great many cases brought directly under the Fourteenth Amendment, the consequence of judicially creating a less demanding standard for section 1981 than for the Fourteenth Amendment might often be to circumvent the holding in *Washington v. Davis* altogether. In the vast array of cases such as the one before us now and *Washington v. Davis* itself, where Title VII does not apply but Section 1981 and the Fourteenth Amendment do, one could easily avoid the intent requirement of the Amendment by simply pleading section 1981.[10] *See Croker v. Boeing Co.,* 437 F.Supp. 1138 (E.D.Pa. 1977).

Finally, an observation made by the Supreme Court in *Washington v. Davis* is relevant here. The Court was concerned about the problems that might arise if the Fourteenth Amendment could be invoked upon a mere showing of disproportionate racial impact:

A rule that a statute designed to serve neutral ends is nevertheless invalid, absent compelling justification, if in practice it benefits or burdens one race more than another would be far reaching and would raise serious questions about, and perhaps invalidate, a whole range of tax, welfare, public service, regulatory, and licensing statutes that may be more burdensome to the poor and to the average black than to the more affluent white.

Given that rule, such consequences would perhaps be likely to follow. However, in our view, extension of the rule beyond those areas where it is already applicable by reason of statute, such as in the field of public employment, should await legislative prescription.

**9.** In addition, the original draft of the 1866 Act, as introduced by Senator Trumball of Illinois, prohibited "discrimination in civil rights or immunities . . . *on account of* race, color, or previous condition of slavery . . . ." *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 288, 96 S.Ct. 2574, 2582, 49 L.Ed.2d 493 (1976) (emphasis added).

**10.** In *Washington v. Davis,* the plaintiffs did plead section 1981. The defendants here argue

that in that decision section 1981 was implicitly held to require a showing of discriminatory intent. The plaintiffs argue that the opposite implication exists. Both sides have a certain logical basis, but a close reading of the Supreme Court's opinion convinces me, as it does the majority, that *Washington v. Davis* simply does not consider the standards governing section 1981.

426 U.S. at 248, 96 S.Ct. at 2051 (footnote omitted) Section 1981, extending as it does far beyond "the field of public employment" to the expansive realm of both public and private contractual relationships, might well precipitate many of these same consequences if proof of discriminatory intent is not required.

For these reasons I would base defendants' liability for the use of the 1972 examination on Title VII alone. The majority's reliance on section 1981 is ill-advised because it is both unnecessary and incorrect.

### C. The Scope of the Remedy

Even if the plaintiffs have established a Title VII violation with respect to the defendants' use of the 1972 written test results, however, that violation does not necessarily justify the imposition of minority hiring quotas on the defendants. The use of quotas must be carefully weighed. As the Supreme Court stated in Griggs v. Duke Power Co., supra, 401 U.S. at 430–31, 91 S.Ct. at 853:

Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to

discriminate on the basis of racial or other impermissible classification.

In this case the trial judge ordered that 20 percent of all newly-hired firemen be black and that 20 percent be Mexican-American, compared to the respective proportions of those minorities in the population of 10.8 percent and 18.3 percent. Imposition of this hiring quota may well result in discrimination against equally or better qualified applicants solely on account of their race. Here, for example, a native American Indian, Asian-American, Hungarian-American or Polish-American may not be hired in order to provide a job for a black or Mexican-American. While quotas are sometimes necessary to correct past discrimination against certain groups, the possible prejudicial effects upon others must be weighed carefully by the district court.[11]

In civil rights cases, "[a]s with any equity case, the nature of the violation determines the scope of the remedy." Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). Accord, Milliken v. Bradley, 418 U.S. 717, 744, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). In fashioning remedies under Title VII, it is therefore essential to identify accurately the nature of the violations that have occurred. Here, the district judge believed he had properly found the defendants liable not only for their thwarted attempt to use the 1972 exam results in a discriminatory manner, but also for their use in earlier years of the examinations which actually produced the racial imbalance in the fire department's work force. It is obvious that the quotas were imposed to remedy that racial imbalance,[12] and thus that in

---

11. See McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) (section 1981 and Title VII prohibit racial discrimination in private employment against white persons as well as against nonwhites). Cf. Franks v. Bowman Transp. Co., 424 U.S. 747, 780–81, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) (Burger, C. J., concurring and dissenting) (white employees injured by award of retroactive seniority to nonwhites may petition for equitable relief on their own behalf); Weber v. Kaiser Alum. & Chem. Corp., 415 F.Supp. 761 (E.D.La.1976) (Title VII prohibits discrimination against white employees; private employment context).

I agree, of course, that equitable relief to rectify past discrimination will often impose burdens on those innocent of any discriminatory activity. Franks v. Bowman Transp. Co., supra, 424 U.S. at 773–79, 96 S.Ct. 1251. But, as I explain in the subsequent text, relief appropriate to the violation in this case requires the imposition of no such burdens.

12. In his conclusions of law, the district judge stated:

[I]t appears that unless the Court orders accelerated hiring at the Los Angeles County Fire Department, there will not be sufficient hiring of blacks and Mexican-Americans as is necessary to overcome the presently existing

devising his hiring order, the district judge relied heavily upon his conclusion that the defendants were liable for their use of the pre-1972 examinations. For the reasons that follow, this reliance was misplaced.

The majority concedes that none of the defendants' examination procedures except the aborted attempt to use the 1972 exam results in a discriminatory manner were properly before the district court. I agree. The complete absence of standing on the part of any plaintiff to contest the earlier procedures makes them legally indistinguishable from the act described in *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), which could have been, but was not, properly brought before a federal court:

> A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences.

*Id.* at 558, 97 S.Ct. at 1889.[13] Therefore, the district court was not entitled to treat the pre-1972 examination procedures as substantive violations to be corrected, but only as "relevant background" to the narrow issues properly before him.

Moreover, even if the pre-1972 examinations could be properly considered by the district judge as background, their relationship to the defendants' Title VII violation militates against taking them heavily into

account. The remedial obligation of the district court was first and foremost to grant relief for the violations of law properly found to exist. It is true that judicial remedies sometimes attempt to correct past discrimination as well, *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), but this is because present violations often "operate to 'freeze' the status quo of prior discriminatory employment practices." *Griggs v. Duke Power Co., supra*, 401 U.S. at 430, 96 S.Ct. at 853.

The Title VII violation in this case had no such effect. Both the majority and I agree that the defendants are liable for nothing more than devising a plan—never carried out—which would have had a discriminatory impact. The plaintiffs concede in their brief that in fact "the post-March 1972 discrimination . . . had no 'effects.'" Because the racial imbalance of which the plaintiffs complain was neither aggravated nor perpetuated by the defendants' actionable discrimination, the liability of defendants for that limited threat of discrimination does not create a proper platform from which to reach back to correct the racial imbalance.[14]

Even under the majority's view of this case, a remand is essential. Had the district judge initially found the defendants liable for as little as this court does today, I cannot believe he would have imposed the drastic remedy which the majority now sustains. It is conceded that the only objectionable "use" of a written examination by the defendants was their intent to narrow the field of applicants to the top 544 scorers

---

effects of *past discrimination* within a reasonable period of time . . . . .
(Emphasis added).

**13.** It is not only the standing issue that made it improper for the district court to rely upon the pre-1972 procedures in fashioning its remedial order, but also the fact that even a plaintiff with standing could probably not have shown them to be illegal. Since Title VII first became applicable to the defendants on March 24, 1972, liability for the defendants' conduct previous to that date must be evaluated under

section 1981. But that statute, as I explain above, appears to require proof of a discriminatory intent, and the district judge explicitly found as a matter of fact that such intent was lacking here.

**14.** "At the threshold we observe that Title VII speaks only to the future. The only justification for a backward gaze is in determining whether a *present* employment practice may, in fact, perpetuate past discrimination." *EEOC v. University of N. M.*, 504 F.2d 1296, 1301 (10th Cir. 1974).

on the 1972 exam. This plan was made only after an apparently nondiscriminatory system (interviewing randomly selected applicants who passed the 1972 exam) was enjoined in a state court proceeding. It came when the defendants were under the great stress of needing to fill mounting vacancies and at a time when they were affirmatively working to end prior discriminatory practices.

In light of these facts, I would reverse and remand to the district court for reconsideration of the appropriateness of quotas in this case.[15] It is clear to me that the court can fashion an effective order prohibiting any discriminatory use of the 1972 examination directly without imposing quotas.

---

**15.** It is instructive to compare with this case one from the Second Circuit in which the district court's imposition of quotas was reversed as unwarranted. *Kirkland v. New York State Dept. of Correct. Serv.,* 520 F.2d 420 (2d Cir. 1975), *cert. denied,* 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976). The case involved a challenge to the use of a discriminatory written test as the basis for promotion under a civil service system. The plaintiffs challenged the disproportionate impact of only the most recent test and made no claim of bad faith or intentional discrimination. The district court ordered the defendants to develop a validated nondiscriminatory promotion procedure and imposed pro-

motion quotas to cure the effects of past discrimination. The Second Circuit upheld the order to develop a nondiscriminatory procedure, but rejected the imposition of quotas. The court also noted that quotas would unnecessarily nullify the state constitutional provisions requiring that promotions be made from the top three officers on the eligibility list, a decision which should be left to "the people speaking through their legislators." *Id.* at 429.

*See also Chance v. Board of Examiners,* 534 F.2d 993 (2d Cir. 1976) (racial quotas in public employment layoffs not designed to remedy past discrimination are not authorized under section 1981 or Title VII).